1999 PA Super 27

Barry L. STRAYER, Appellee,

v.

Jody L. RYAN, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 7, 1998.

Filed Feb. 16, 1999.

James Keenan, York, for appellant.

Diane G. Radcliff, Camp Hill, for appellee.

Before KELLY, BROSKY and BECK, JJ.

BECK, J.:

¶ 1 This is an appeal from an order granting a petition for DNA/blood tests to determine the paternity of a one and a half-year-old child. We affirm.

¶ 2 Appellant mother, Jody L. Ryan, and appellee putative father, Barry L. Strayer, were involved in a sexual relationship in the summer of 1996. Shortly after their relationship ended in September 1996, mother suspected that she was pregnant and informed appellee of that fact. They purchased a home pregnancy test, which confirmed the pregnancy. Appellee accompanied mother to prenatal testing early in the pregnancy, but had only occasional telephone contact throughout the rest of the

---

pregnancy. Mother gave birth to a son, Logan Joshua–Stuart Ryan, on June 3, 1997.

¶ 3 In August 1997, appellee requested visitation rights with the child. Mother replied that she would consider his request, but no visitation was ever permitted. Appellee also offered to contribute to the financial support of the child, but Mother refused to accept the support offered. Appellee then retained counsel and in January 1998, when the child was seven months old, filed a complaint for custody. A scheduled custody conciliation conference was continued pending resolution of the paternity issue.

¶ 4 On February 3, 1998, appellee filed a Petition for DNA/Blood Tests to Determine Paternity. At the hearing on the petition, mother testified that she did have sexual relations with appellee during the time when she conceived the child, but could not recall if she had had sexual relations with anyone else during the time of possible conception. She stated that she opposed appellee's petition for paternity testing and his attempt to secure partial custody of her child because she was presently involved with another man who had established a relationship with the child and whom she regarded as the "father" of her child. Mother admitted, however, that her new boyfriend was not the child's biological father. She also testified that she thought that permitting appellee to have a relationship with her child would be disruptive for the child.

¶ 5 Further testimony at the hearing revealed that Mother's new boyfriend did not live with her and the child and in fact held a job that required him to be out of town five days a week. He has not assumed responsibility for the financial support of the child and mother has never held him out as the biological father.

¶ 6 On March 3, 1998, the trial court entered an order granting the petition for paternity tests. In its opinion in support of this order, the trial court concluded that based on mother's own testimony it would appear that appellee is the only man who could possibly be the child's biological father. Therefore, the trial court framed the issue as simply whether Mother's allegation that the child has developed a relationship with her new boyfriend and that appellee's participation in the child's life would be disruptive is enough to preclude appellee from obtaining paternity tests to confirm his paternity as a precursor to obtaining partial custody of the child. In the trial court's view, the standard to be applied in answering this question was whether it would be in the child's best interests to allow appellee to confirm his paternity and, presumably, to enter into a paternal relationship with the child. Since the trial court concluded that such would be in the child's best interests, it allowed the paternity testing to go forward.

¶ 7 Although we agree with the trial court's ultimate disposition of this case and find that appellee is unquestionably entitled to have paternity tests conducted to confirm his paternity, we find no support in the law for the trial court's analysis based on the best interests of the child. We hold that where, as here, a man who has reason to believe that he is the father of a newborn child comes forward within months of the child's birth and attempts to establish his paternity so that he will be able to engage in a full paternal relationship with the child, and where the facts do not give rise to any countervailing presumption of paternity or to a claim of estoppel, blood testing to establish paternity should be ordered.

¶ 8 Unlike many cases wherein the paternity of a child is at issue, this case does not involve any presumptions concerning the identity of the child's father. Mother was not married when the child was conceived or born. Nor does this case involve questions of estoppel such as are raised in paternity cases where a man has held a child out as his own and supported the child and then attempts to deny his paternity or where a mother seeks and accepts support of a child from one man who she claims is the father and then seeks to establish that another is the child's father. *See, e.g., Martin v. Martin*, 710 A.2d 61, 62–63 (Pa.Super.1998) (reviewing principles of presumption of paternity and estoppel). Rather, this case presents a much more straightforward scenario.

¶ 9 As the trial court noted, although Mother has assiduously avoided admitting that appellee is the child's biological father, she could not recall having sexual relations with anyone else during the time of possible conception. In addition, she has not suggested that anyone else is the father, having left the father's name blank on the child's birth certificate. She has not sought or received child support from any other man.

¶ 10 Appellee, the putative father, has acted in a consistent manner with respect to this child. Appellee strongly suspects that he is the child's father and, if he is, he wants to fulfill his paternal obligations. His attempts to confirm his own paternity, and even to contribute to the child's support, have been thwarted by Mother, who simply argues that appellee would be a disruptive presence in the child's life and that she would prefer to have her current boyfriend assume a fatherly role. She believes that as between her current boyfriend and appellee, the former will be better for the child and has already established a relationship with him. She contends that this alone is legally sufficient to thwart appellee's attempt to ascertain and act upon his biological paternity.

¶ 11 In support of this position, mother cites to a single authority, *C.T.D. v. N.E.E. and M.C.E.*, 439 Pa.Super. 58, 653 A.2d 28 (1995). Her reliance is misplaced. In *C.T.D.*, mother was involved with three men at the time of conception. One was C.T.D. and another was M.C.E. Mother and C.T.D. terminated their relationship during the pregnancy but mother and M.C.E. continued their relationship and, after the child's birth, married. The child's birth certificate was then amended to indicate that M.C.E. was the father. When the child was two years old, C.T.D. filed a custody complaint and petition for blood tests. On appeal from the grant of the latter, mother and M.C.E. argued that they had now established a family unit including the child and that C.T.D.'s attempt to establish paternity, occurring when the child was already two years old, should be denied.

¶ 12 The *C.T.D.* Court recognized that the case before it involved no presumption of paternity, since the child was not born or conceived during marriage, and that no traditional estoppel principles applied. However, the court also stated that C.T.D.'s failure to have any contact with the child or to act on his paternity claim for two years might bar him from now seeking to establish his paternity through blood testing. *Id.* at 60–61, 653 A.2d at 30–31. The court remanded for a determination of whether C.T.D. had abandoned the child and had allowed a familial relationship that should not be disturbed to develop between M.C.E. and the child. *Id.* at 62–64, 653 A.2d at 31–32.

¶ 13 There is no factual analogy to be drawn between the case before us and *C.T.D.* Unlike *C.T.D.*, this case does not involve a putative father who waited years before attempting to obtain custody of his child and there is no family unit including a new father and the child. Here, appellee sought to determine if he was the father of this child and to participate in both the responsibilities and privileges of fatherhood from the very beginning of the child's life. In fact, even after appellee was frustrated in his attempts to do so without resort to legal action, he still filed his custody complaint when the child was only seven months old.

¶ 14 Nor is there any evidence of an intact family consisting of Mother, child and another man which might be disrupted by appellee's assumption of fatherly rights and responsibilities. Mother and her new boyfriend have been involved for less than a year and see each other only on certain weekends or holidays. They are not married or engaged to be married. Neither party has held the child out to be the child of Mother's boyfriend.

¶ 15 The proper analysis of the rights of the parties is not a balancing of the merits of two men, appellee and mother's boyfriend, to determine which would better serve the best interests of this child in fulfilling the role of father.[1] This is not a custody dispute be-

---

1. We recognize, as did the trial court, that in *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993), the Supreme Court held that interlocutory orders directing paternity blood tests are immediately appealable because to delay appeal until after the tests had already been conducted ignored the

tween two acknowledged parents. Mother's boyfriend is clearly a biological stranger to this child and is not a member of the child's "family" by any definition of that word. Appellee, on the other hand, may well be the child's biological father and he seeks to receive legal confirmation of that fact and to establish a parental relationship with the child.

¶ 16 DNA paternity testing, with its pinpoint accuracy, has posed more squarely than ever before a dilemma in paternity testing. Before the advent of DNA testing, the determination of paternity could not be as accurately established as it can today. Because the truth can be so reliably revealed, the policy question as to whether to expose the truth or whether to bypass the truth for some important family or societal reasons has taken on added meaning. While we recognize that the right to paternity testing is not absolute and there may be strong family or societal reasons to deny paternity testing, such testing should be favored and a parent should be able to assert his legally protected interest in his or her child. The establishment of a parent-child relationship is important to both parent and child. A father and his child have the right to establish a kinship relationship and the child has a right to expect both financial and emotional support from his or her father. Furthermore, a child's biological history may be essential to his or her future health, and the child's cultural history may be important to his or her personal well being.

¶ 17 Thus, we recognize appellee's right to establish his paternity and to participate in the care of his child. Moreover, we applaud appellee's prompt and consistent efforts to take responsibility for this child. Mother cannot be permitted to thwart these efforts simply because she now believes that appellee is not her first choice as a father for her child. Appellee has rights that Mother cannot unilaterally deny him. Moreover, appel-

lee has responsibilities he appears to be willing to fulfill. Finally, there is no intact family including this child that will be disrupted by appellee's participation in the child's life. There is no societal interest in preserving Mother's relationship with her boyfriend or his relationship with this child that rivals the legal right of appellee to secure definitive paternity testing.

¶ 18 The order of the trial court is affirmed. The case is remanded for prompt effectuation of the trial court order granting appellee's petition for DNA/blood testing. Jurisdiction relinquished.

best interests of the child involved, whose life might be significantly disrupted by allowing the testing to go forward. However, the *Jones* Court did *not* hold that in deciding if paternity testing should be allowed, the substantive legal standard is simply whether the testing serves the best interests of the child. Although the interests of

the child are certainly relevant, the ultimate determination of the issue does not depend on such a singular inquiry. Rather, as we have previously indicated, whether to allow paternity testing raises issues of presumptive paternity, estoppel, and both societal and familial interests.