David A. SNYDER, Appellee

v.

Jeverlie A. WYLAND, Jackie
N. Wyland and Beverly A.
Wyland, Appellants.

Superior Court of Pennsylvania.

Submitted Jan. 6, 2003.

Filed April 2, 2003.

Revised May 5, 2003.

Gerald M. Nelson, Altoona, for appellants.

John Woodcock, Hollidaysburg, for appellee.

Before: JOYCE, STEVENS and
TAMILIA, JJ.

TAMILIA, J.

¶ 1 Jeverlie A. Wyland, mother, and
Jackie N. and Beverly A. Wyland, her
parents, appeal the June 13, 2002 Order
directing mother, minor child and putative
father, appellee David A. Snyder, to submit to blood tests to determine the paternity of minor child.

> Appellant believes the trial court
> erred and/or abused its discretion in ordering blood testing. Appellant believes
> the record properly reflects that we
> have a situation where the putative father has abandoned the child and as
> such the doctrine of estoppel shall bar
> him from being able to come into court
> obtaining an order directing that blood
> testing occur between the parties and
> minor child.

Appellants' brief at 9. In support of their
argument, appellants rely on *C.T.D. v.
N.E.E. and M.C.E.*, 439 Pa.Super. 58, 653
A.2d 28 (1995).

¶ 2 On June 13, 2002, the court conducted an evidentiary hearing to address the
April 23, 2002 petition filed by appellee/putative father requesting that blood testing

occur for the purpose of determining the paternity of the minor child. The facts as gleaned from that proceeding follow.

¶ 3 At the time of the July 1, 1999 birth of minor child, mother was 16 years of age and putative father (hereinafter appellee) was 17 and finishing his junior year in high school. Appellee, now 21–years–of–age, testified he and mother were high school sweethearts when she became pregnant. She told him the child she was carrying was his, and he believed her. They continued their emotional and physical relationship up until the time the child was born, with appellee and his mother being present at the hospital at the time of the birth. Unbeknownst to appellee, "father" was listed on the birth certificate as unknown. After child's birth, the parties' on-going romantic relationship was terminated, mother's father (child's paternal grandfather) refused appellee's phone calls and threatened arrest should appellee come to their home. Also, within six weeks of child's birth, mother and her parents (appellants) entered into a consent Order granting maternal grandparents custody of child. Over the next two years, however, on up to ten separate occasions, mother took child to visit appellee, either in outdoor settings or at the homes of appellee's grandmother or friend. These visits were arranged by pager and/or cell phone. Mother also provided appellee with a picture of child, introduced into evidence at the hearing. An attempt by appellee to financially support child was refused by appellants. Christmas gifts bought by appellee for child were picked up by mother and taken to child. Appellee testified he did not pursue formal visitation or custody sooner because he did not have the financial ability, he was emotionally immature, he was unaware of the custody consent agreement between mother and her parents, and he was unaware of his legal recourse. Once becoming financially and emotionally stable, appellee stated he went to the local courthouse in an effort to assert his parental rights. N.T., 6/13/02, 1–20.

¶ 4 Appellee's mother, Lorie Ann Claar, testified on her son's behalf that mother told her child was appellee's, she and appellee were both at the hospital when child was born, and congratulations were offered by mother's family to appellee on the birth of "his son." *Id.* at 36–38. Thereafter, while Claar and appellee did attempt to see child, tensions between the families were strained and mother's father informed Claar she and appellee were not welcome at their home. *Id.* at 37–40. Claar corroborated appellee's testimony that mother did bring child to visit with appellee on various occasions. Claar acknowledged she did not pursue her rights as a grandparent, but she did and does offer her morale support to appellee as father of child.

¶ 5 Mother, now age 20, testified she dated appellee while in high school and told him and his mother that he was indeed the father of her child. *Id.* at 21–22, 25. When asked by counsel to explain why she had not named appellee as father on the birth certificate, however, mother replied she had had multiple sexual partners while she was dating appellee. *Id.* at 25. Mother also conceded, in response to the trial court's query, that while both appellee and his mother were present at the hospital when child was born, no other purported sexual partner was present. *Id.* at 22. While not stated in the record, it is apparent appellee was notified mother had gone into labor and to what hospital she had been taken. Mother admitted resuming her relationship with appellee following child's birth, but denied taking child to visit appellee. She stated that while she did give appellee a picture of child following child's first birthday, she refused

Christmas gifts offered by appellee, and appellee's only offer of financial support was rescinded when he feared his check would bounce. Mother, who now resides only with child and her mother, her parents having separated, testified that following child's birth, appellee threatened to kidnap child if she denied him visitation. Mother argued generally child had a good life, her father acted as child's male role model, and she was disinterested in who was child's natural father. *Id.* at 20–34.

¶ 6 Mother's father, appellant Jackie Wyland, also testified on his own behalf. Wyland testified that following the birth of child, as a consequence of appellee's late-night phone calls and threats of kidnapping, he did order appellee to not come onto his property. *Id.* at 44–45. Wyland also testified that while he did order appellee not to call their residence, he never told Claar she was not allowed to see child. *Id.* at 46–47. Wyland acknowledged appellee's presence at the hospital when child was born but stated mother never told him appellee was the birth father.

¶ 7 The trial judge heard this testimony and apparently found appellee credible. We will not disturb this finding. *See Luminella v. Marcocci,* 814 A.2d 711 (Pa.Super.2002) (holding that because the trial court, sitting as the trier of fact, conducts an evidence-balancing test from the vantage point of being best able to judge credibility of witnesses and the weight to be assigned thereto, we will defer to its opinion).

 ¶ 8 "The doctrine of estoppel in paternity actions is aimed at achieving fairness as between the parents by holding them, *both* mother and father, to their prior conduct regarding paternity of the child." *McConnell v. Berkheimer,* 781 A.2d 206, 210 (Pa.Super.2001) (emphasis in

original), *quoting Freedman v. McCandless,* 539 Pa. 584, 592, 654 A.2d 529, 533 (1995). While the doctrine of estoppel is routinely employed to prevent a parent, or one acting in *loco parentis,* from *denying* his or her parental obligation, here appellants seek to deny, on this basis, appellee's rights as child's father.

¶ 9 We find *C.T.D., supra,* relied upon by appellants, to be factually distinguishable from the matter before us. In that case, unwed mother was having sexual relations with three men at the time child was conceived. No father was named on the June 22, 1990 birth certificate and mother's relationship with putative father/appellee ceased two days later. At that time, mother was involved in an exclusive relationship with one of the three men, appellant M.C.E. They ultimately married on March 5, 1992, and a new birth certificate naming M.C.E. as father of child was issued. The other two men with whom mother was involved at the time of conception, appellee and S.M., began legal proceedings on March 24, 1992, requesting blood tests of all parties.[1] After an evidentiary hearing, the court ordered the tests.

¶ 10 Mother and M.C.E. appealed, arguing appellee was estopped from making a paternity claim as too much time had passed, and they had married and established a family unit. This Court reversed the Order directing the blood tests and remanded for a hearing to determine whether putative father's actions, or better said "lack thereof," amounted to abandonment. The *C.T.D.* Court reasoned that while mother and named father's (M.C.E.'s) actions may have prevented them from challenging M.C.E.'s paternity, their actions (marrying, changing the birth certificate, holding child out as M.C.E.'s)

1. S.M., the third possible father, withdrew from the lawsuit.

did not prevent putative father from asserting his alleged paternity. It was only putative father's arguable failure to actively assert his rights in timely fashion that caused remand for an evidentiary hearing.

¶ 11 While we agree with and find applicable to the case before us the *C.T.D.* Court's conclusion putative father cannot be denied his right to assert his alleged paternity, the circumstances presently under consideration are vastly different from those existing in *C.T.D.* First and foremost, here we are dealing with parents who were minors at the time of the child's birth. On that basis alone they logically and legally were unable to assert their rights until they reached their majority and without the financial aid of their parents. Mother, despite her minority, entered a contract with her parents relinquishing custody of child to them, thereby establishing them as custodial guardians of the child. By doing so, she bargained away child's right to any possible financial or emotional support by his birth father. A parent cannot bargain away his or child's rights. *See e.g. McMichael v. McMichael,* 700 A.2d 1337 (Pa.Super.1997); *see also C.T.D., supra, citing Mastromatteo v. Harkins,* 419 Pa.Super. 329, 615 A.2d 390, 394 (1992), *appeal denied,* 535 Pa. 648, 633 A.2d 152 (1993) (holding child is entitled to know and be supported, financially and emotionally, by his or her biological father).

¶ 12 Appellee, moreover, readily admits that at age 17 he was financially and emotionally too immature to challenge the custodial guardians and assert his rights as father. The testimony of record by custodial guardian grandfather supports this averment, alleging appellee called his home at inappropriate hours and threatened to kidnap child if he was not allowed to see him. Unlike the putative father in *C.T.D.,* here appellee took affirmative steps, although perhaps immature, to establish a relationship with his child. Now age 21, appellee testified he is ready to assert his parental rights and assume responsibility for the child he believes to be his son.

¶ 13 Also unlike the situation in *C.T.D.,* here mother actively involved appellee with child, albeit only on occasion, taking child, apparently unbeknownst to the custodians, to various locations in order to allow visitation. She also acknowledged appellee's attempt to give child Christmas gifts and money, as well as appellee's telephone calls. While mother's testimony concerning the identity of child's birth father was equivocal, telling the court her relationship with appellee was exclusive, while telling counsel she had multiple sex partners, mother testified repeatedly that she did indeed tell appellee that child was his. The court, sitting as the trier of fact and ruling in favor of a blood test, apparently found her testimony concerning child's paternity questionable.

¶ 14 We conclude appellee did not abandon child so as to preclude the Order directing blood tests to establish paternity. His behavior evidenced an interest and intent to maintain a relationship with the child from which the trial court properly could find there was no abandonment. The trial court neither erred nor abused its discretion by ordering the parties to submit to blood tests.

¶ 15 Order affirmed.