**Christine BUCCIERI, Appellant,**

v.

**Salvatore A. CAMPAGNA, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 19, 2005.

Filed Dec. 7, 2005.

Michael D. Fioretti, Philadelphia, for appellant.

Dana Rakinic, Jenkinstown, for appellee.

BEFORE: FORD ELLIOTT, STEVENS, and GANTMAN, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, Christine Buccieri ("Mother"), appeals from the order of the Philadelphia County Court of Common Pleas, which granted the petition for paternity testing, filed on behalf of Appellee, Salvatore A. Campagna.[1] Mother asks us to determine whether the trial court erred when it ordered genetic testing under the facts of this case. We hold the trial court's decision was flawed. Accordingly, we reverse.

¶ 2 In its opinion, the trial court summarized the facts of the case as follows:

The parties in this case were never married. On March 16, 2004 [Appellee] filed a Complaint for Partial Custody of [G.B.] (d.o.b. November 8, 1996), the

---

1. This Court accepts immediate appeals from orders directing or denying genetic testing to determine paternity. *See generally T.L.F. v. D.W.T.*, 796 A.2d 358 (Pa.Super.2002).

[child] of [Mother]. On June 4, 2004, [Appellee] also filed a Petition for Paternity Testing asserting that at the time [G.B.] was conceived the parties were briefly involved with one another in a sexual relationship. It is undisputed that no one was listed as the father on the birth certificate of this child and that there was never a voluntary acknowledgement of paternity executed by anyone.

On June 18, 2004, [Mother] filed Preliminary Objections to the Complaint for Custody and on June 30, 2004, [Appellee] filed a Motion to Dismiss [Mother's] Preliminary Objections. Thereafter, [Mother] filed an Answer to [Appellee's] Motion to Dismiss.

On November 12, 2004, [Mother] filed an Answer to the Petition for Paternity Testing which contained an averment [in her New Matter] that the paternity testing should be denied on an equitable estoppel claim. All petitions were consolidated and a hearing was conducted before this court on November 18, 2004. The testimony evidenced the parties agree that the child at issue [G.B.] was born on November 8, 1996. The parties further agree that they were never married and that they had an intimate, but brief relationship in 1996 around the time that [G.B.] was conceived. Further they agree that upon termination of the relationship, the parties had no further contact except for a very brief, chance encounter a number of years after [G.B.] was born. [Mother] testified that she was not seeing anyone else sexually during [the parties'] relationship and that she had no doubt that [Appellee] was [G.B.]'s biological father. She also stated she told [Appellee] that she was pregnant but asserted that he did not believe her. [Mother] never filed a paternity action or petition for support and [Appellee] never filed any paternity action or acknowledged paternity of this child.

At the hearing on November 18, 2004, [M]other's fiancé, L.B., testified. Although still married at the time, it was his testimony that he was in the process of divorcing his current wife and when that divorce was final he intended to marry [Mother] and file a petition to adopt her children. Sometime after the hearing a Stipulation was submitted to the [c]ourt acknowledging that [Mother] had in fact married [L.B.] and he had in fact filed a Petition to Terminate Parental Rights and to adopt the child at issue.... [At the beginning and again] [u]pon conclusion of the November 18th hearing this court dismissed [Appellee's] Complaint for Partial Custody without prejudice and proceeded thereafter only on the Petition for Paternity Testing.[2]

2. The court dismissed Appellee's custody complaint without prejudice, as a procedural matter, so that Appellee's petition for paternity testing could be heard pursuant to Pa. R.C.P.1930.6, which in pertinent part provides:

**Rule 1930.6. Paternity Actions**

(a) Scope. This rule shall govern the procedure by which a putative father may initiate a civil action to establish paternity and seek genetic testing. Such as action shall not be permitted if an order already has been entered as to the paternity, custody or support of the child, or if a support or custody action to which the putative father is a party is pending.

Pa.R.C.P. 1930.6(a). *See also* Pa.R.C.P. 1915.3(d) (stating: "If the mother of the child is not married and the child has no legal or presumptive father, then a putative father initiating an action for custody, partial custody or visitation must file a claim of paternity pursuant to 23 Pa.C.S. § 5103 and attach a copy to the complaint in the custody action. Note: If a putative father is uncertain of paternity, the correct procedure is to commence a civil action for paternity pursuant to the procedures set forth at Rule 1930.6").

On March 10, 2005, [Mother] filed an appeal of this court's order to the Superior Court. On the same date, [Mother] filed a Motion for a Stay Pending Appeal, which this court granted on March 31, 2005. This court then entered an order directing [Mother] to file a Statement of Matters Complained of on Appeal in accordance with Pa.R.A.P. 1925(b). [Mother] filed her [Rule] 1925(b) Statement on April 21, 2005.

(Trial Court Opinion, filed May 20, 2005, at 2–4). We add the following facts. Mother testified she had no doubt Appellee was G.B.'s father. (N.T. Hearing, 11/18/04, at 27–28). Appellee also admitted on cross-examination that G.B. was his child and agreed to sign an acknowledgment of paternity on the day of the hearing. (*Id.* at 66). When asked why he felt he still needed genetic testing, Appellee said, "I don't know." (*Id.*) In his next breath, Appellee retracted his agreement to sign an acknowledgment of paternity and refused to sign without testing. The following exchange took place:

[Mother's counsel]: So then you are not sure that you are [G.B.]'s father?

[Appellee]: I guess there's always that 1 percent but, I mean, I look at her and she looks exactly like me. She looks like me.

[Mother's counsel]: So then—

[Appellee]: I am sure.

(*Id.* at 67–68). Appellee further admitted he knew about Mother's pregnancy. He claimed he was unaware of the birth of the child. He conceded he had made no further inquiries and had no contact with Mother or child until a chance meeting in the park, sometime in 2000 or 2001, when he saw G.B. for the first time. (*Id.* at 68–69). When asked what action Appellee took in the court system after that meeting, Appellee admitted, "None." (*Id.* at 70). In fact, Appellee acknowledged he had allowed another three to four years to pass, before he filed a complaint for partial custody and his petition for paternity testing in 2004. When asked why he thought it would be in the child's best interests to initiate some connection with Appellee, he said: "Why do I think that? Because I am her father. I am her flesh and blood. I have a lot to offer this child. I have unconditional love that I'm waiting to give her." (*Id.* at 71).

¶ 3 Following the hearing, the court asked the parties to brief their issues and set a briefing schedule. By order dated March 10, 2005, the court granted Appellee's petition for paternity testing. The trial court also indicated that its order was a final order. (*See* Trial Court Order, dated March 10, 2005, at 2).

¶ 4 Mother now raises four issues on appeal:

SHOULD PUTATIVE FATHER'S PETITION FOR GENETIC TESTING HAVE BEEN GRANTED DESPITE THE FACT THAT PUTATIVE FATHER'S CONDUCT WAS TANTAMOUNT TO AN ABANDONMENT OF CHILD?

SHOULD PUTATIVE FATHER BE EQUITABLY ESTOPPED FROM ASSERTING HIS PATERNITY AND THEREFORE, HIS PETITION FOR GENETIC TESTING BE DENIED AS A RESULT OF THE UNCONTRADICTED EVIDENCE AT THE HEARING OF THIS MATTER?

SHOULD PUTATIVE FATHER'S REQUEST FOR GENETIC TESTING HAVE BEEN DENIED BECAUSE TO GRANT SUCH A REQUEST WOULD NOT BE IN THE BEST INTEREST OF THE CHILD?

SHOULD PUTATIVE FATHER'S REQUEST FOR GENETIC TESTING BE HELD IN ABEYANCE PENDING RESOLUTION OF THE PETITION FOR ADOPTION AND PETITION

FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS THAT HAS BEEN FILED BY MOTHER AND HER HUSBAND?

(Mother's Brief at 5).[3]

■ ¶ 5 For ease of disposition, we address Mother's issues collectively as a single argument. Mother argues, pursuant to established Pennsylvania law, a putative father's conduct is relevant to his right to request genetic testing. Specifically, Mother asserts Appellee should be estopped from obtaining genetic testing to assert paternity rights, eight years after the child's birth. Mother maintains the uncontradicted evidence of record makes clear Appellee left Mother one week after he learned of her pregnancy, he did not acknowledge paternity at any time after the child's birth or initiate contact with the child for eight years. Even after a chance meeting in 2000 or 2001, at which Appellee claims he "first" learned of the child's existence, Appellee waited another three to four years before instituting his complaint for partial custody and his petition for genetic testing. Mother submits Appellee has essentially forfeited his right to genetic testing and to his paternity, by virtue of his conduct of abandonment for the last eight years.

¶ 6 Additionally, Mother avers the minor child has had for the past three years and continues to enjoy a father-daughter relationship with Mother's husband, whom the child knows as "Dad." Mother, her husband, the child and the child's two sisters have an intact family structure. Mother submits her creation of a family with another was certainly foreseeable to Appellee. Thus, it is irrelevant whether Appellee actually knew of the specific relationship between the child and Mother's husband. For eight years, Appellee ac-

cepted the *status quo* of no contact and no responsibility. Now, he must live with the reality of his past conduct and the fact that G.B. is part of an intact family that does not include Appellee. Appellee's intrusion into the family unit as a virtual stranger is disruptive and destabilizing to the child and her family.

¶ 7 Finally, Mother observes the trial court erred as a matter of law when it reasoned that Appellee's conduct of abandonment is not a valid issue in his proceeding to obtain genetic testing. Mother contends to the contrary that Appellee should be estopped by his prior conduct from denying paternity, demanding genetic testing, or asserting parental rights. For these reasons, Mother concludes the trial court's order granting Appellee's petition for genetic testing should be reversed. We agree.

¶ 8 The Uniform Act on Blood Tests to Determine Paternity, at 23 Pa.C.S.A. § 5104, provides in relevant part as follows:

§ 5104. **Blood tests to determine paternity**

\* \* \*

(b) **Scope of section.—**
(1) **Civil matters.—**This section shall apply to all civil matters.

\* \* \*

(c)**Authority for test.—**In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as

---

**3.** By letter dated September 23, 2005, Appellee's counsel informed the Superior Court that his client directed counsel not to partici-pate in this appeal. Appellee also directed counsel not to file a brief or appear for oral argument.

not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. **If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others or the interests of justice so require.**

\* \* \*

23 Pa.C.S.A. § 5104(c). Pennsylvania law makes clear:

> [W]hile the Act creates a statutory right to obtain blood testing to determine paternity, **the right is not absolute** and must be balanced against competing societal/family interests.

*C.T.D. v. N.E.E.*, 439 Pa.Super. 58, 653 A.2d 28, 30 (1995) (internal citations and quotation marks omitted) (emphasis added).

 ¶ 9 Generally, estoppel in paternity issues is "aimed at 'achieving fairness as between the parents by holding **both** mother and father to their prior conduct regarding paternity of the child.'" *Freedman v. McCandless*, 539 Pa. 584, 592, 654 A.2d 529, 533 (1995) (quoting *Gulla v. Fitzpatrick*, 408 Pa.Super. 269, 596 A.2d 851, 856 (1991) (emphasis in original)). "Where the principle [of estoppel] is operative, [paternity] tests may well be irrelevant, for the law will not permit a person . . . to challenge the status which he or she has previously accepted." *Matter of Green*, 437 Pa.Super. 606, 650 A.2d 1072, 1074 (1994).

¶ 10 In *Strayer v. Ryan*, 725 A.2d 785 (Pa.Super.1999), the biological mother and the putative father had been involved in a sexual relationship. Shortly after the relationship ended, the mother suspected she was pregnant and informed the putative father. Thereafter, the parties confirmed the pregnancy with a home test. The putative father accompanied the mother to prenatal testing but had only occasional telephone contact with her throughout the rest of the pregnancy. On June 3, 1997, a son was born. Two months later, in August 1997, the putative father requested visitation, but none was ever granted. The putative father also offered to contribute to the child's support, but the mother refused his offer. The putative father retained counsel and, in January 1998, he filed a complaint for custody. The child was then seven months old. On February 3, 1998, the putative father filed a petition for blood tests to determine paternity. The mother opposed the putative father's custody complaint and his petition for DNA testing, because she was currently involved with another man who had a "relationship" with the child. She admitted that her current boyfriend was not the child's biological father or ever held out as such; that he did not live with her and the child; and that he had not assumed financial responsibility for the child. The mother also opposed visitation because she felt it would be disruptive to the child. On March 3, 1998, the court decided, on the basis of the mother's testimony, that the putative father was the only man who could have fathered the child. The court concluded that the mother's objections were insufficient to preclude DNA testing and that it was in the best interests of the child to allow the putative father to confirm his paternity and possibly enter into a relationship with the child. The court allowed the DNA testing. The mother appealed.

¶ 11 On appeal, this Court affirmed, but specifically rejected the court's analysis based on the best interests of the child. Instead, the *Strayer* Court held:

> [W]here . . . a man comes forward within months of the child's birth and attempts to establish his paternity so that he will be able to engage in a full paternal relationship with the child, and **where the facts do not give rise to any coun-**

tervailing presumption of paternity or to a claim of estoppel**, blood testing should be ordered.

*Id.* at 786 (Pa.Super.1999) (emphasis added). The Court explained:

DNA paternity testing, with its pinpoint accuracy, has posed more squarely than ever before a dilemma in paternity testing. Before the advent of DNA testing, the determination of paternity could not be as accurately established as it can today. Because the truth can be so reliably revealed, the policy question as to whether to expose the truth or whether to bypass the truth for some important family or societal reasons has taken on added meaning. While we recognize that the right to paternity testing is not absolute and there may be strong family or societal reasons to deny paternity testing, such testing should be favored and a parent should be able to assert his legally protected interest in his...child. The establishment of a parent-child relationship is important to both parent and child. A father and his child have the right to establish a kinship relationship and the child has a right to expect both financial and emotional support from his or her father. Furthermore, a child's biological history may be essential to his or her future health, and the child's cultural history may be important to his or her personal well being.

*Id.* at 788.

¶ 12 Compare the case of *C.T.D., supra,* in which the putative father, C.T.D., brought suit against the biological mother to compel her and her child to submit to blood testing for the purpose of establishing that he was the father of the child. Before her pregnancy, the mother had been involved with three different men, including C.T.D. During her pregnancy, the mother continued to be involved with one of the three men but also had some limited nonsexual contact with C.T.D. As the pregnancy progressed, contact between C.T.D. and the mother lessened. Contact ceased just after the child's birth, on June 22, 1990, when the mother told C.T.D. that the baby was a boy and that she was with someone else. The mother also chose not to name the father of the child at that time. The mother eventually married on December 31, 1991. On March 5, 1992, a new birth certificate was issued for the child, naming the mother's husband as father. On March 24, 1992, the mother received a letter from C.T.D.'s attorney requesting all parties, including her husband, to submit to blood tests to determine the paternity of the child. The mother refused. On June 22, 1994, C.T.D. filed a complaint, seeking partial custody and visitation of the child, and a petition for blood tests. Although a consent order for the blood tests was originally entered, the mother challenged it and sought a protective order. Following an evidentiary hearing, the court ordered the blood tests, and the mother appealed.

¶ 13 On appeal, the mother argued that C.T.D. was estopped from requesting the blood tests, because his petition had not been filed until the child was almost two years old. In the interim, she and her husband had established a family unit, and C.T.D. had failed during that time to assert any parental right to the child. This Court stated:

Paternity by estoppel...applies to those situations where blood tests may well be irrelevant, for the law will not permit a person in [those] situations to challenge the status which he or she has previously accepted. While it is clear that paternity by estoppel could be applied to preclude [the mother or her husband] from challenging [husband's] paternity, we find no support for the argument that **their** actions can estop C.T.D. from asserting his alleged paternity. Instead, we find that C.T.D.'s **failure to act dur-**

ing [the child's] first two years of life may have effectively estopped him from now raising his claim of paternity.

From 1990 to 1992, C.T.D. had no contact with either mother or child. By his own account, he made no attempt to establish a relationship with [the child] or offer him any financial support. Under these circumstances, we hold that a determination of whether C.T.D. abandoned [the child] is **crucial to the disposition of this case.**

*Id.* at 31 (emphasis added). Analogizing to Section 2511(a)(1) of the Adoption Act, this Court stated:

[I]n a case as the one presented here, the trial court should determine if the putative father has failed to timely exert his parental claim. Part of that determination should examine whether [the mother and her husband] by their actions frustrated C.T.D.'s ability to seek custody or visitation. If there is no evidence that [the mother or her husband] prevented C.T.D. from visiting the child or that C.T.D. made any attempt to establish paternity for two years, the request for blood tests **should be denied.**

* * *

We have carefully considered C.T.D.'s rights [to share in the support and companionship of a child who may be his own] but we believe that he may have relinquished those rights through his actions.

* * *

Therefore, if the court finds C.T.D. has failed to exercise his parental claim, there is no reason to disturb the familial relationship that has developed between [the child, the mother and her husband]. Accordingly, we find it necessary to remand this matter to the trial court for a determination of whether C.T.D.'s actions amounted to an abandonment of his potential paternal responsibilities to the degree that he allowed an uncontested father-child relationship to develop between [the mother's husband and the child]. If the court finds that C.T.D. abandoned [the child], C.T.D.'s request for blood testing **should be denied.**

*Id.* at 31–32 (emphasis added). As a result, this Court reversed the order for paternity tests and remanded for further proceedings on the abandonment issue.

¶ 14 Both *Strayer* and *C.T.D.* emphasize that the right to paternity testing is not absolute. *See id.* There might be strong family or societal reasons to deny paternity testing. *Id.* Thus, under Pennsylvania law, the doctrine of estoppel is a fundamental and viable consideration in a proceeding for paternity testing and is not limited to termination of parental rights or adoption cases. *Id. See also Snyder v. Wyland,* 821 A.2d 611 (Pa.Super.2003) (holding putative father did not abandon child so as to estop him from obtaining paternity testing).

¶ 15 Recently, our Supreme Court employed the doctrine of equitable estoppel when it precluded the putative father from establishing his paternity twelve years after the child's birth. *See In re Adoption of S.A.J.,* 575 Pa. 624, 838 A.2d 616 (2003). The Supreme Court stated:

Although estoppel has been applied most frequently to prevent fathers from **denying** paternity when they have acted as fathers in the lives of their children, the doctrine applies equally to the instant situation where [putative father] denied his paternity, never held himself out to be father, and never took responsibility, financial or otherwise, for Child.

\* \* \*

[Putative father] has been absent from Child's life over the course of her twelve years. Mother and Husband have taken the entire responsibility for Child. Appellant is equitably estopped from undoing the situation that he created, by his words and by his failure to act.

*Id.* at 639, 838 A.2d at 625 (emphasis in original).

¶ 16 Instantly, the trial court provided the following reasoning in support of its decision to grant Appellee's petition for paternity testing:

The only issue before this court is whether [Appellee]'s request for paternity testing should be granted. [Mother] claims that it should be denied because of estoppel. Pennsylvania statutes provide that a man may acknowledge the paternity of a child by signing a voluntary acknowledgment at a hospital, by signing an acknowledgment of paternity before the court or by requesting that genetic testing be ordered by the court. In this case [Appellee] elected to file a Petition for Paternity Testing. [Mother] claims paternity testing should not be allowed because the child is now 8 years of age and [Appellee] has never been involved in this child's life. This court cannot find any justification to deny [Appellee] his right to this genetic testing. Even if the court were to find [Mother's] allegations to be true, while those allegations might be an issue in the termination of [Appellee's] parental rights, **they are not an issue in his right to request genetic testing.**

This is not a case in which the parties doubted the paternity of [Appellee]. By Mother's own testimony she stated in court that she knew he was the father. Despite knowing he was the father, she never pursued any claim against him. [Appellee], although at times stating that he wasn't sure that this was his child, testified that he had reason to suspect that it could be his child.

There are no presumptions of paternity in this matter. Even though Mother's situation in life has changed, specifically her engagement and later marriage . . . , this does not serve to deny [Appellee]'s right to request genetic testing. Science has advanced to the point that the paternity of this child can be established by a noninvasive procedure such as a saliva swab, and under Pennsylvania statute and case law [Appellee] is entitled to ask for this procedure.

If [Appellee] had signed an Acknowledgment of Paternity within the last 8 years, his action for custody would have proceeded as would [Mother's] action for termination of parental rights. The issue before this court is not the termination of [Appellee's] parental rights, but whether those parental rights should be established to begin with. In her current situation this child has no father. There is no father listed on the birth certificate and although [Mother's husband] has recently established a relationship with the child and is willing to have his name placed on that birth certificate through an adoption, that does not negate [Appellee's] right to step forward at this point and say that he believes he is the father and that he should be entitled to genetic testing. Thus, this court saw no reason to delay the adjudication of [Appellee's] request for genetic testing to await hearings that may take place in the future on the separate issues of adoption and termination of parental rights.

(Trial Court Opinion at 4–6) (emphasis added). We cannot accept the court's reasoning, because it is based on what the court has interpreted as Appellee's "absolute right" to paternity testing. This interpretation conflicts with established stat-

utory and case law in Pennsylvania. *See Strayer, supra; C.T.D., supra.*

¶ 17 Further, the record does not support the court's decision. The uncontested evidence of this case makes clear Appellee had no contact with G.B. and performed absolutely no parental duties for eight (8) years. Mother told Appellee she was pregnant. Mother did not hide her pregnancy or her whereabouts from Appellee; he knew where she lived. Although Mother did not desire any contact or involvement by Appellee, she did nothing to obstruct or prevent Appellee from requesting information about the pregnancy or offering to assume the paternal role. Yet, Appellee did nothing. Mother's failure to contact Appellee or identify him formally as G.B.'s father does not alone constitute the kind of obstructive tactics deplored under Pennsylvania law. Appellee could have easily monitored the pregnancy and try to establish contact after G.B.'s birth.

¶ 18 Even if we accept Appellee's assertion that he did not know about G.B.'s birth until his chance meeting four years later, still Appellee did nothing with regard to asserting his parental rights until another four years had passed. Appellee did not ask to see G.B. or make any attempt to communicate or offer support. Appellee continued to ignore his responsibilities as G.B.'s father, until 2004, after he filed his complaint for partial custody and his petition for paternity testing.

¶ 19 Moreover, Mother has formed a new family unit. Mother's husband has been involved in parenting G.B. for three years. G.B. lives with Mother, her husband, and G.B.'s two sisters. Mother's husband wants to adopt G.B. and her older sister; Mother's husband is the father of G.B.'s younger sister. The family unit has stabilized, an event that was surely foreseeable to Appellee. *See id.*

¶ 20 On this record, Appellee's own delay and inactivity for eight years now bars him from confirming or asserting his paternity **through genetic tests.** When balanced against societal concerns for constancy in the child's life, we see no reason to allow Appellee to march into G.B.'s life at this late date. As a practical matter, G.B.'s health and social history can still be completed. The record raises no genuine question as to whether Appellee is G.B.'s biological father. Under the circumstances of this case, Appellee is estopped by his own past conduct from obtaining genetic tests to establish his paternity and/or assert his paternal rights. *Id.*

¶ 21 Based upon the foregoing, we hold the court erred when it granted Appellee's petition for paternity testing. Accordingly, we reverse.

¶ 22 Order reversed.

¶ 23 *Judge STEVENS concurs in the result.