# Klingensmith v. Kuhn

C.P. of Indiana County, no. 12237 C.D. 2005.

*Edward Klingensmith,* pro se.
*Debra L. Yost* for defendant Esther Kuhn.
*James Klingensmith,* pro se.

HANNA, *J.,* August 10, 2006—This matter comes before the court on the plaintiff's complaint to establish paternity and for genetic testing and James Klingensmith's motion to intervene. The court granted James Klingensmith's motion to intervene during the hearing, which occurred on May 16, 2006. For the reasons set forth below, the court denies plaintiff's complaint to establish paternity and for genetic testing.

## FACTS AND PROCEDURAL HISTORY[1]

On March 6, 2003, Esther Kuhn gave birth to a daughter out of wedlock. James Klingensmith was present at the birth of the child and completed an acknowledgment of paternity declaration. Following the child's birth, Indiana County Children and Youth Services arranged for the placement of the child with Earl and Mabel Klingensmith, James' parents. Esther and James had visitation with the child.

---

1. The court derives these facts from the pleadings and the testimony of all the parties at the hearing.

In January 2004, Esther commenced custody litigation. Earl and Mabel Klingensmith along with James were defendants in this action. Following numerous court proceedings, including three days of hearings, this court granted primary physical custody of the child to Mabel and Earl Klingensmith.[2] James, although incarcerated, participated in the proceedings.

On December 13, 2005, Edward R. Klingensmith filed a "complaint to establish paternity and for genetic testing." Edward and James are brothers and also sons of Mabel and Earl Klingensmith. Edward's complaint averred that he may be the father of Esther's daughter and agreed to pay the costs of paternity tests. A hearing was scheduled for May 16, 2006.

James filed a motion to intervene on March 31, 2006, asserting estoppel based on his acknowledgement of paternity and other actions he participated in regarding the child, including custody and support. On April 4, 2006, this court scheduled the motion to be heard at the same time as Edward's paternity complaint.

A hearing occurred on May 16, 2006. Present was Edward, who proceeded pro se. Edward is incarcerated at SCI Pine Grove, Indiana County, Pennsylvania. Esther was present and represented by counsel. James participated by telephone and also proceeded pro se. James is an inmate at SCI Albion.

---

2. See *Susan McCloskey, on behalf of Esther Kuhn v. James Klingensmith, Mabel and Earl Klingensmith,* 10143 CD 2004 (unpublished, Indiana County Court of Common Pleas), *aff'd,* no. 333 WDA 2005 (non-precedential decision).

Edward offered testimony from Esther, his mother, Mabel Klingensmith and himself. Esther testified that she and Edward had sexual relations, although she could not say whether the relations occurred during the likely period of conception, June 2002. Esther denied that Edward ever contacted her following the child's birth. Esther stated that she did not have a sexual relationship with Edward and James at the same time. On rebuttal she provided additional testimony that it was her belief that she and Edward had a sexual relationship in March 2002.

Edward stated that he was incarcerated in either July or August of 2002. He was first incarcerated at SCI Smithon and was transferred to SCI Pine Grove about two years ago. Edward believes that he and Esther had unprotected sexual relations on at least two or three occasions in June or July 2002, when Esther resided with mutual friends. He learned of Esther's pregnancy in July or August 2002.

Edward has not filed a putative father claim,[3] or sent the child cards or gifts. He said he was unaware of the custody action filed by Esther and did not participate in this proceeding. In response to questions from James, he denied disavowing paternity of the child in correspondence to James' girlfriend.

Edward's contact with the child occurs during his calls to his parents when he inquires about her welfare and

---

3. 23 Pa.C.S. §5103(b) permits the filing of a claim of paternity with the Department of Public Welfare if the mother of the child fails or refuses to join in an acknowledgement of paternity. A filed claim of paternity entitles the putative father to notice of any proceeding brought to terminate parental rights to the child.

occasionally talks with her. He claims to have written a letter to the Indiana County Domestic Relations Section in December 2004. He received a response to this correspondence dated December 7, 2004, from Kristi Hughes, Enforcement Officer.[4] In this letter, Ms. Hughes acknowledged receipt of Edward's letter of December 6, 2004, and told him that Esther had not filed a child support claim. She further told him that "[u]ntil Ms. Kuhn files a claim, our office cannot assist you in determining paternity. If you wish to pursue this matter, you will need to contact a private attorney."

Mabel Klingensmith was also called as a witness by Edward. Mrs. Klingensmith confirmed that Edward had made calls and asked about the child.

Edward explained that his main motivation for filing the paternity action was to find out if he is the child's biological father. He offered to pay for the costs of genetic tests.

James testified on his own behalf. He noted that he acknowledged paternity after the child's birth and that he has acted as her father. Edward cross-examined James on his ability to father a child due to injuries from a car accident. James responded by noting that he and the child share a genetic condition regarding their eye color.

---

4. Edward submitted this letter to the court as evidence following the hearing. Esther's counsel and James were given an opportunity to object to the submission of this document. No response was received from Esther's attorney. James informed the court that he did not object to its admission.

## DISCUSSION AND ANALYSIS

Pennsylvania Code title 23 §5104 creates a statutory right to obtain blood testing, but that right is not an absolute right. See *C.T.D. v. N.E.E. and M.C.E.,* 439 Pa. Super. 58, 61, 653 A.2d 28, 30 (1995) (citing *Donnelly v. Lindenmuth,* 409 Pa. Super. 341, 344, 597 A.2d 1234, 1235 (1991)). The right to obtain paternity testing must be balanced against competing social and family interests. *Id.* Several cases have dealt with this issue and provided guidance for balancing these sometimes competing interests.

The *C.T.D. v. N.E.E. and M.C.E.* court analyzed a situation similar to the one before us today. In *C.T.D.,* the mother acknowledged that there were three possible fathers for her pregnancy. She continued a relationship with one of those men and eventually married him. After the marriage, a new birth certificate was issued for the child with the husband's name as the father. One year and nine months after the child's birth (and after the mother had married), C.T.D. initiated a paternity action. C.T.D. was aware of the mother's pregnancy and had letter and phone contact with her during this time. After the child's birth, C.T.D. had no contact with the child and made no offer of financial support. The *C.T.D.* court held that C.T.D.'s failure to act during the first two years of the child's life may have estopped him from raising a claim of paternity. *Id.* at 63, 653 A.2d at 31. The case was remanded to the trial court to determine whether the child's mother prevented C.T.D. from visiting the child or whether C.T.D. had made any attempt to establish paternity prior to initiating a paternity action one year and nine months after the child's

birth. The *C.T.D.* court stated that if the trial court found that C.T.D. had abandoned his potential paternal responsibilities during the first two years of the child's life, C.T.D.'s request for blood testing should be denied. *Id.* at 64, 653 A.2d at 32. The two crucial factors that the *C.T.D.* court found outweighed C.T.D.'s right to blood testing were the length of time he waited to seek a paternity determination and the established familial relationship that would have been disrupted by a paternity test.

These two factors were again crucial in the court's decision when a similar situation arose 10 years later in *Buccieri v. Campagna,* 889 A.2d 1220 (Pa. Super. 2005). In *Buccieri,* Salvatore Campagna sought paternity testing seven and one-half years after the birth of the child. At the time of the hearing, the mother of the child was engaged to a man who testified that he intended to adopt the child after the marriage. Although the mother acknowledged that Campagna was the likely biological father as he was the only man she was intimate with at the time of conception, the court denied Campagna's petition for paternity testing. *Id.* at 1228. The mother had informed Campagna of her pregnancy, although at the time he stated he did not believe her. A number of years after the child's birth, Campagna by chance encountered the mother and child in a park. He still allowed three to four additional years to pass before petitioning for paternity testing. *Id.* at 1222. The *Buccieri* court held that the need for constancy in the child's life outweighed Campagna's right to paternity testing. Because of Campagna's delay and inactivity, during which time the mother formed a new family unit, he was estopped from obtaining paternity testing. *Id.* at 1228.

Between the time *C.T.D.* and *Buccieri* were decided, the Superior Court heard two cases in which paternity testing was granted: *Strayer v. Ryan,* 725 A.2d 785 (Pa. Super. 1999) and *Snyder v. Wyland,* 821 A.2d 611 (Pa. Super. 2003). In *Strayer,* only eight months elapsed between the time of birth and the date on which Strayer filed a petition for paternity testing. Although Strayer was not present at the birth, he accompanied the mother to early prenatal testing and had occasional phone contact with her during the pregnancy. After the birth of the child, Strayer offered financial support, but his offer was refused. When the child was two to three months of age, he sought visitation with the child. The mother refused to permit any visitation. Although the mother was in a new relationship at the time Strayer filed his petition, her paramour did not financially support the child and had never been held out as the child's biological father. *Strayer,* 725 A.2d at 786. The *Strayer* court held that because Strayer was prompt in asserting his paternal interest and there was no family structure that would be disrupted, Strayer was entitled to paternity testing. *Id.* at 788.

Similarly, the *Snyder* court granted Snyder's petition for paternity testing, relying on the fact that Snyder took immediate and active steps to be a part of his child's life. In *Snyder,* the mother was 16 years old at the time of the birth, and Snyder was 17. The two had an ongoing relationship during the mother's pregnancy and Snyder believed the child was his. Snyder and his mother were present at the birth of the child, although without Snyder's knowledge the father was listed as "unknown" on the child's birth certificate. Within six weeks of the child's birth, the mother entered into a consent order granting

her parents custody of the child. The mother's parents refused Snyder access to their home and would not take his phone calls. However, on 10 occasions over the next two years, the mother allowed Snyder to see the child. Snyder bought Christmas presents for the child and offered financial support, although this support was refused. *Snyder,* 821 A.2d at 612. The *Snyder* court distinguished this case from the *C.T.D.* case by relying on the facts that Snyder took immediate steps to establish a relationship with the child and, although two years and nine months elapsed between the child's birth and the time when Snyder filed a petition for paternity testing, Snyder was a minor at the time of the birth and unable to effectively assert his rights.

The facts of the case before us more closely resemble the *C.T.D.* and *Buccieri* cases, rather than the *Strayer* and *Snyder* cases. Esther and James maintained a relationship during Esther's pregnancy. James acknowledged paternity at the time of birth and has acted as the child's father. Although he is currently incarcerated, he has actively participated in an ongoing custody action. His incarceration has prevented much direct participation in the child's life, but the child does have an established family unit and, as in *C.T.D.* and *Buccieri,* there is a societal interest in not disrupting that unit. Again as in *C.T.D.* and *Buccieri,* the putative father, Edward, has been slow in acting on his rights. Although Edward was incarcerated soon after the time of conception, he was aware of the pregnancy.[5] Edward and James are brothers and

---

5. The court acknowledges that Edward's incarceration has made paternity establishment and assuming parental responsibility more

the child currently lives with their parents. Although Edward has asked about the child when he speaks on the phone with his parents, he has never sent the child any cards or gifts or made any attempt to develop a paternal relationship with the child. He took no action until one year and nine months after the birth of the child, at which time he sent a letter to the Indiana County Domestic Relations Section with an inquiry about establishing paternity. He waited an additional year, until the child was two years and nine months old, to file a complaint for paternity. Unlike the *Strayer* and *Snyder* cases, Edward has never made an offer of financial support for the child. No testimony indicated that attempts on his part to establish a relationship with the child were frustrated by the mother or anyone else involved in caring for the child. Following the *C.T.D.* line of reasoning, waiting to act for two years and nine months of a child's life demonstrates abandonment and estops a claim of paternity. Edward's right to a paternity test is outweighed by the social interest in maintaining the child's existing family unit and his actions in abandoning the child for almost three years.

During the testimony, Edward stated that he wants genetic tests to find out if he is the child's biological father. His desire to know this fact is understandable. However, biological parenthood is a "fact," while legal

---

challenging. Nonetheless, a parent's responsibilities are not tolled during his incarceration. A reviewing court "must analyze whether the parent utilized those resources available while in prison to maintain a relationship with his child." *In re Adoption of Dale A. II and Wayne Allen B.,* 453 Pa. Super. 106, 117, 683 A.2d 297, 302 (1996).

parenthood is a *combined question of fact, law and public policy:*[6]

"As case law and statutes on establishment of paternity, on estoppel, on equitable adoption on reproductive technology and on adoption illustrate, the identity of the 'legal father' is determined by examining many different facts: has this man raised the child, held the child out as his own, does the child know him as 'Daddy,' is his name on the child's birth certificate, has he agreed in a separation agreement or been ordered by a court to pay child support, has he interfered with the child's relationship with his biological father, creating a reliance interest; was he married to or attempted to marry the child's mother?" *Testimony of Barbara Bennett-Woodhouse, Professor of Law, University of Pennsylvania Law School,* 21(3) Pa. Fam. Law. 92 (1999).

Genetic tests could prove Edward's paternity of the child, but not her legal parentage. A child's legal father is not merely a matter of biology. It is also the person who accepted parental responsibility voluntarily and early, and who, through his consistent commitment to the child, meets her basic needs. Legal parenthood is not merely based on an act of procreation. It can also be earned by an adult who meets the child's needs and is committed to the child. While Edward may want to know the "truth" of the child's paternity, he has not earned the right, nor is, in this case, the "truth" in the child's best interest.

6. For an excellent analysis of a child centered approach to paternity, see Barbara Bennett-Woodhouse, *Hatching the Egg: A Child Centered Perspective on Parents' Rights,* 14 Cardozo L. Rev. 1746 (1993); see also, *Dr. Seuss, Horton Hatches The Egg* (1940).

146

Wherefore, the court makes the following order:

ORDER

And now, August 10, 2006, upon consideration of plaintiff's complaint to establish paternity and for genetic testing and hearing thereon, it is hereby ordered and directed that plaintiff's petition is denied.