2015 VT 53

## Kimberley Dyke v. Frank Scopetti

[121 A.3d 684]

No. 14-232

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

Opinion Filed April 3, 2015

128

*Todd C. Steadman* of *Davis Steadman & Ford LLC*, White River Junction, for Plaintiff-Appellee.

*George E. Spaneas* of *Spaneas Law Office*, Lebanon, New Hampshire, for Defendant-Appellant.

¶ 1. **Robinson, J.** This case involves a father's obligation to pay college tuition for his daughters pursuant to a Pennsylvania child-support order. Father appeals the trial-court order requiring him to pay specified college-tuition costs for his two daughters. We affirm.

¶ 2. The underlying facts are not in substantial dispute. The parties, father Frank A. Scopetti, Jr., and mother Kimberley Marie Scopetti, were married in Pennsylvania and had two daughters. They entered into a separation agreement on July 30, 1998, when their elder daughter, Indie, was six years old, and their younger daughter, Francesca, was five years old. The separation agreement is a two-page, handwritten document. Paragraph 4 of the agreement provides: "Frank Scopetti agrees to provide college tuition for Francesca .and Indie [at] an institution acceptable to Frank Scopetti." The separation agreement was incorporated into a final decree of divorce issued in Pennsylvania on May 18, 2000.

¶ 3. Following the parties' divorce, mother and the daughters moved to Vermont, and father moved to Arizona. On September 28, 2010, mother registered the parties' Pennsylvania support order in Vermont.[1] That fall, Indie began studying at George Mason University (GMU) in Virginia. During the 2010-11 school year, father paid only a portion of Indie's tuition.

¶ 4. On August 19, 2011, mother filed a motion to enforce Paragraph 4 of the separation agreement. In response, father argued that he was not obligated to pay any college tuition because the parties' agreement was illusory and unenforceable. He further argued that even if the contract was enforceable, his obligation to "provide college tuition" was excused by the nonoccurrence of the condition precedent: father's "acceptance" of the choice of institution. Finally, he argued that $10,000 per year was a reasonable amount under Paragraph 4, and that the sums he had already paid toward the daughters' college tuition represented an amount that was acceptable to him because it was all he could afford.

¶ 5. In a December 2012 order, the magistrate granted mother's motion to enforce. The magistrate concluded that "[i]t was clearly the intention of the parties that [father] would be responsible for college tuition costs albeit with some input as to the extent of his obligation provided by the requirement of consultation and approval." The magistrate concluded that "[n]oncompliance with a consultation condition . . . should not eliminate the obligation completely, but should require that the obligor parent assume some reasonable portion of the child's educational expenses." The magistrate noted that various courts have found that "[w]hat is considered 'reasonable' . . . may vary depending on a variety of circumstances," including the costs of comparable colleges, the parents' ability to pay and station in life, the parents' own education (and their "collegiate expectations" for their children), and the child's educational needs. The magistrate scheduled a further hearing to determine what a "reasonable" contribution would be.

¶ 6. In April 2013, the magistrate held a hearing to determine what a "reasonable" amount was for father to contribute for his

---

[1] In the trial court, the parties litigated whether the college-tuition provision was a matter of child support subject to jurisdiction in Vermont under the Uniform Interstate Family Support Act. 15B V.S.A. §§ 101-904. On appeal, father does not challenge this Court's jurisdiction over this matter.

daughters' college tuition. The magistrate made the following findings.[2] Both daughters did well in high school and chose practical educations that would enable them to be employed immediately upon graduation. Indie chose nursing as a career and had the goal of advanced degrees in that field. She chose to attend GMU because it was near a city and had a respected nursing program. Father never told Indie that he found GMU acceptable. Indie did not apply to the nursing program at the University of Vermont (UVM), where she would have paid the in-state student rate (which was $12,888 in 2011-12, and $13,344 in 2012-13). Nor did she want to attend college in Arizona.

¶ 7. For the 2010-11 school year (Indie's freshman year), tuition was $25,440, and her total cost of attendance was $38,233. She received scholarships and grants of $12,100 and a work-study grant of $2,250. Father paid $13,500 toward Indie's tuition. Indie took out loans to cover the remaining costs.

¶ 8. For the 2011-12 school year (Indie's sophomore year), GMU's cost of attendance was $43,193, with tuition accounting for $27,000 of that amount. Indie received $17,300 in scholarships and grants, and $2,000 in work-study. Father paid $15,201 toward GMU tuition, and Indie covered the balance with loans.

¶ 9. Indie then transferred to the University of Maryland Baltimore School of Nursing (UMSON) in the fall of 2012. She did not get father's approval for the transfer. Indie believed that UMSON offered a higher-status clinical program and school ranking than GMU. The cost of attendance at UMSON for the 2012-13 school year was $57,087, with tuition accounting for $27,012 of that amount. While the UMSON tuition was comparable to GMU, Indie's actual costs were significantly higher because Indie forfeited the scholarship and grant funds that she had received at GMU. As a transfer student, she was eligible only for a Pell Grant of $3,200. Father paid $5,000 toward her fall 2012 tuition, and at the time of the April 2013 hearing had not made any payment for the spring term. Indie took out $36,500 in loans to cover the balance of the costs.

---

[2] Some of the magistrate's specific findings concerning the cost of tuition, or the amount of loans or scholarships, vary from the findings in the December 2012 order. We rely on the findings from this latter hearing that was focused more specifically on these issues. These findings formed the basis for the magistrate's ultimate calculations and judgment.

¶ 10. In the fall of 2011, Francesca enrolled in the four-year dental-hygiene program at the University of New England (UNE) in Maine. Although Vermont Technical College (VTC) offers a two-year dental-hygiene program, no institution in Vermont offers a baccalaureate dental-hygiene program, which offers better career opportunities and higher earning potential than two-year programs. Northern Arizona University has a dental-hygiene program comparable to UNE's, but Francesca lived in Arizona for a short time and did not like it there. The cost of attendance at UNE for the 2011-12 and 2012-13 school years combined was $88,546.72, of which $60,180 was tuition. Francesca earned scholarships and grants of $46,400 over these first two school years, and father paid $18,845.27 toward UNE tuition. Francesca took out loans to meet the difference.

¶ 11. The magistrate found that the daughters grew up in a "very modest living situation" with a mother who worked two jobs, attended college classes at night, and recently received an online degree qualifying her to be an administrative assistant in health care. Mother and the daughters lived in a mobile home on rented land.

¶ 12. Father has degrees from Pennsylvania State University and the Indiana University of Pennsylvania. At the time of the parties' divorce, father owned his own business and earned around $200,000 annually. For the past seven years, father has been the senior vice president of a construction company in Phoenix. In 2011, his taxable wages, not counting his pretax contributions for health and retirement benefits, were $331,913. In 2012, his gross (prededuction) wages were $403,326. In 2013, father's base salary was $192,610; however, the magistrate found that he has typically earned bonuses between $164,000 and $210,000 per year. Father and his wife also own a thoroughbred horse farm which operated at a loss of $35,000 in 2013 and $40,000 in 2012. Father's monthly expenses of $14,000 include $1,500 per month in veterinary and horse expenses and $1,400 per month for golf fees related to entertaining clients.

¶ 13. The magistrate found that the parties contemplated the children going to college and addressed the costs in their divorce agreement when the children were young. They did not mention a particular amount in their agreement. Father appears to have adopted his position that $10,000 per year per daughter was the maximum amount that he was obligated to pay as the older

daughter began preparing for college. The magistrate found that this amount would not even cover the cost of in-state tuition for the daughters at UVM.

¶ 14. On the basis of these findings, the magistrate concluded that father's determination that his obligation is limited to $10,000 is unreasonable in light of the costs of tuition and father's income and ability to pay. The magistrate explained that "Mr. Scopetti can withstand a loss of $40,000 in a horse breeding business. He chooses to pay more in veterinary bills than he pays for either of his daughter's educations." The magistrate thus concluded that it was reasonable for father "to pay the tuition at the children's chosen colleges after all scholarships and grants have been applied to the charges on the · children's accounts for tuition, fees, room and board," with "[a]ny other cost of attendance [being] the responsibility of the children." The magistrate provided that any amount of grant or scholarship that remained after nontuition costs of attendance were satisfied should be credited against father's obligation for tuition.

¶ 15. The magistrate made an exception to this determination for Indie's 2012-13 school year. The magistrate found Indie's decision to transfer to UMSON, which resulted in a significant loss of grant and scholarship funds, to be "an unreasonable financial decision to make in light of the ongoing dispute over the cost of tuition and the failure to involve her father in that decision." Accordingly, the magistrate calculated father's obligation for the 2012-13 school year "as if Indie had continued to attend [GMU] using the 2011-12 costs for the 2012-13 school year," reducing father's financial obligation. For the subsequent 2013-14 school year, however, the magistrate ordered father to pay the full cost of tuition at UMSON.

¶ 16. Father appealed from the magistrate's order to the superior court, arguing that there was no contract because the parties had no "meeting of the minds" and Paragraph 4's terms were illusory and thus unenforceable; that he had no obligation to pay any tuition because of a failure of a condition precedent (his "acceptance of the tuition costs"); that applying scholarships or grants received by the daughters first to their nontuition costs of attendance was error; that the magistrate erroneously failed to apply Pennsylvania law to the parties' agreement; and that the magistrate erred in applying a reasonableness analysis.

¶ 17. The superior court affirmed the magistrate's judgment. Applying Pennsylvania law, the court concluded that the agreement was not indefinite or illusory, because mutuality of obligation existed and because father's "past payments for his daughters' tuition costs demonstrate[d] a clear intent to be bound" by the contract. Turning to the condition-precedent argument, the superior court considered two decisions of the Superior Court of Pennsylvania (the intermediate appellate court in that state) on the issue. The Vermont superior court concluded that the language in Paragraph 4 was most similar to language that the Pennsylvania court concluded did not create a condition precedent.

¶ 18. Having determined that the contract was valid and father had an enforceable duty, the court then construed the scope of that duty. The court rejected father's argument that the magistrate "effectively rewr[o]te the parties' agreement by adding a term of 'reasonableness' " and affirmed the magistrate's conclusion that father's view of an "acceptable" tuition cost was unreasonable. With respect to father's argument that any scholarships or grants should first be applied to tuition before other expenses, so as to reduce the amount father paid, the court concluded that "no requirement exists in the parties' agreement or elsewhere that financial aid garnered by the daughters must be primarily applied to lessen their father's burden." Accordingly, the court affirmed the magistrate's prior orders. Father substantially renews his arguments on appeal to this Court.

¶ 19. In reviewing a child-support order on appeal, we consider legal issues de novo. *Pahnke v. Pahnke*, 2014 VT 2, ¶ 17, 195 Vt. 394, 88 A.3d 432. We accept the magistrate's findings of fact unless they are clearly erroneous. *Id.*

## I. Condition Precedent and Implied Reasonableness Requirement

¶ 20. Father argues that the language "[at] an institution acceptable to Frank Scopetti" in Paragraph 4 requires consultation and approval as a condition precedent to father's obligation to pay any tuition, and that the magistrate improperly implied a "reasonableness" requirement with respect to father's exercise of his right of approval or disapproval. Because these two arguments are related, we consider them together.

¶ 21. ██ ██ In interpreting marital-settlement agreements, Pennsylvania courts apply the law of contracts and seek to ascertain

the intent of the parties.[3] *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004). In accordance with Pennsylvania law, "[w]e must give effect to every word and clause" of a legal instrument, "so as not to render any provision nugatory or mere surplusage." *In re Estate of Smertz*, 701 A.2d 268, 270 (Pa. Super. Ct. 1997). We must "construe the contract only as written and may not modify the plain meaning under the guise of interpretation." *Little v. Little*, 657 A.2d 12, 15 (Pa. Super. Ct. 1995) (quotation omitted).

¶ 22. Pennsylvania's intermediate appellate court has thrice considered cases similar to this case.[4] In *Fina v. Fina*, the divorcing spouses' settlement agreement provided that the father "agree[d] to be responsible for twenty five (25%) of the cost of the college tuition . . . [for the daughter], if consulted concerning the choice of an undergraduate school and provided he agrees thereto, which agreement shall not be unreasonably withheld." 1999 PA Super 201, ¶ 1, 737 A.2d 760. In *Fina*, the trial court found that "other than general discussions . . . , [the father] was excluded from [the daughter's] college selection process" and thus the requisite degree of consultation had not occurred. *Id.* ¶¶ 20-21. The appeals court affirmed, concluding that the college-tuition provision created an obligation on the part of the mother and the daughter "to seek [the father's] consultation and agreement regarding . . . college selection." *Id.* ¶ 21. Because this obligation was not met, the father's obligation to pay 25% of the daughter's college expenses never arose. *Id.*

¶ 23. Subsequently, in *Wineburgh v. Wineburgh*, the court considered a marital-settlement agreement requiring the father to pay for the children's college expenses but providing that the

[3] On appeal, both parties apply Pennsylvania law. See *Cavallari v. Martin*, 169 Vt. 210, 218, 732 A.2d 739, 745 (1999) (" '[I]n interpreting a child support order . . . a court shall apply the law of the State of the court that issued the order.' ") (quoting 28 U.S.C. § 1738B(h)(2)).

[4] The Pennsylvania Supreme Court has not addressed the issue. In the absence of guidance from the state supreme court on this point, the decisions of Pennsylvania's statewide appellate court are the best indication of Pennsylvania law. Cf. *Hicks v. Feiock*, 485 U.S. 624, 629-30 & 630 n.3 (1988) (stating, in federal habeas case involving parent held in contempt of child-support order, that " '[w]here an intermediate appellate state court' " makes a " 'considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless [the federal court] is convinced by other persuasive data that the highest court of the state would decide otherwise.' " (quoting *West v. AT&T Co.*, 311 U.S. 223, 237-38 (1940)).

father "will have a say in the choice of college" and that he "will have the right to approve or disapprove a particular college but will exercise that right in a reasonable fashion." 2002 PA Super 415, ¶ 2, 816 A.2d 1105. The court concluded that this provision did not create a condition precedent that affirmatively required consultation with father as a precondition to his obligation to pay. *Id.* ¶ 10 ("We do *not* believe that having 'a say' equates with the requirement to 'consult' and, therefore, the language of the [agreement] does not place an affirmative duty on Mother that would precondition Father's obligation to pay.").

¶ 24. In its most recent case, *Mazurek v. Russell*, which was decided three weeks after the trial-court decision in this case, the Pennsylvania court considered an agreement that provided: "[I]t is the parties' intention that the Children attend such undergraduate institutions as are reasonable and appropriate for the Children, with the parties' mutual consent, which consent shall not be unreasonably withheld." 2014 PA Super 130, 96 A.3d 372, 379. The agreement provided that the father "shall pay one hundred percent (100%) of the reasonable expenses associated with the Children attending such institutions." *Id.* The court found that the father's obligation was to pay for his son's college at an institution mutually agreed to by the parents, and that on the evidence presented, the father's withholding of his consent for the son's chosen college was reasonable. *Id.* at 381-82.

¶ 25. ■ We draw two lessons from this review of pertinent Pennsylvania cases. First, the Pennsylvania courts have been reluctant to infer a "consultation" requirement as a condition precedent to an obligor-parent's obligation to pay in the absence of express language. In this case, the agreement provided merely that father "agrees to provide college tuition for Francesca and Indie [at] an institution acceptable to Frank Scopetti." Although the agreement requires that the institution be acceptable to father — a factor we consider below — it does not (in contrast to the agreement in *Fina*) specifically mandate any advance consultation. We conclude that any absence of consultation with father before the daughters enrolled in college did not in itself defeat father's obligation under the agreement.

¶ 26. ■ Second, Pennsylvania courts have readily enforced agreements conditioning the obligor's obligation to pay upon consent to or agreement with the child's choice of college in cases

in which the obligor expressly agreed not to unreasonably withhold such consent or agreement. *Mazurek*, 96 A.3d at 379, 381-82; *Fina*, 1999 PA Super 201, ¶¶ 1, 21. If the agreement in this case includes such a requirement, the agreement is likely enforceable under Pennsylvania law.[5]

¶ 27. ■ In this case, we conclude that Paragraph 4's "acceptable to [father]" language creates an implied condition that such acceptance not be unreasonably withheld. In general, when an obligor's duty is conditioned on satisfaction with something — in this case, each child's respective college choice — "an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied." Restatement (Second) of Contracts § 228 (1981) [hereinafter Restatement]. The Restatement acknowledges that "[i]f the agreement leaves no doubt that it is only honest satisfaction that is meant and no more, it will be so interpreted," *id.* § 228 cmt. a, but makes it clear that "[w]hen . . . the agreement does not make it clear that it requires merely honest satisfaction, it will not usually be supposed that the obligee has assumed the risk of the obligor's unreasonable, even if honest, dissatisfaction. In such a case, to the extent that it is practicable to apply an objective test of reasonable satisfaction, such a test will be applied." *Id.* § 228 cmt b. The Restatement provides the following illustration:

> A contracts with B to install a heating system in B's factory, for a price of $20,000 to be paid "on condition of satisfactory completion." A installs the heating system, but B states that he is not satisfied with it and refuses to pay the $20,000. B gives no reason except that he does not approve of the heating system, and according to experts in the field the system as installed is entirely satisfactory. A has a claim against B for $20,000 since it is practicable to apply an objective test to the installation of the heating system. This interpretation is also preferred because it reduces A's risk of forfeiture.

*Id.* § 228 ill. 3.

---

[5] Because we conclude that this agreement is properly construed to include such a requirement, we express no opinion on the enforceability under Pennsylvania law of an agreement that does not include such a term.

¶ 28. ▇ The illustrated principle applies with equal force in this context. Accordingly, we conclude that under Pennsylvania law the condition that father is only required to pay for his daughters' tuition if they attend institutions acceptable to him is enforceable, but only insofar as father exercises that discretion reasonably. For this reason, we reject father's argument that the magistrate improperly implied a "reasonableness" requirement into this agreement, and we conclude that the critical question in this case is not whether father accepted the daughters' choices, but rather whether his refusal to accept them was reasonable under the circumstances.

## II. Unenforceability Due to Indefinite Terms or Illusory Promises

¶ 29. Our conclusion that the agreement before us contains an implied condition that father exercise his right to accept or reject daughters' college choices in a reasonable way resolves two other arguments raised by father on appeal. Father argues that the agreement is too vague and indefinite to enforce, because it does not specify whether father is required to pay 100% of tuition or address whether he is required to pay for graduate school or six years of undergraduate tuition, and because the parties have different understandings as to whether and under what circumstances father can refuse to accept a choice of college. In a related argument, father contends that because his obligation to pay was conditioned on his acceptance of his daughters' respective choices — a factor entirely within his control — the agreement was illusory, and is unenforceable for that reason.

¶ 30. ▇ ▇ The indefiniteness of the terms of an agreement is not necessarily a basis for setting aside the agreement. *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1201 (Pa. Super. Ct. 1987) ("Vague and indefinite agreements are routinely enforced as long as courts are able to supply 'reasonable' terms."). The lack of specific figures in the contract does not render the agreement unenforceably indefinite, as father argues. While the contract could have been made more clear, its terms did provide " 'a reasonably certain basis' for a court 'to fashion an appropriate remedy.' " *In re Estate of Rosser*, 2003 PA Super 132, ¶ 19, 821 A.2d 615 (quoting *Dahar v. Grzandziel*, 599 A.2d 217, 220 (Pa. Super. Ct. 1991)); see also *Hathaway v. Hathaway*, 98 S.W.3d 675,

681 (Tenn. Ct. App. 2002) (implying a "condition of reasonableness" in agreement obligating parent to pay for college expenses).

¶ 31. ▬▬▬ Similarly, a promise is illusory only when the promisor commits himself or herself to nothing, so that "the promise is entirely optional with the promisor." *Rosser*, 2003 PA Super 132, ¶ 18 (quotation omitted). The agreement here was not illusory. As set forth above, father's ability to avoid his obligations by declining to accept his daughters' choices is not unlimited. See Restatement § 34 cmt. b (explaining that problems created by apparently unlimited choice given to one party to a contract are often avoided by virtue of express or implied limits on that power of choice, and "[o]ften the choice made must be reasonable in the circumstances.").

¶ 32. Paragraph 4 was part of a marital-settlement agreement involving mutual commitments concerning asset distribution and support. The context of the agreement reflects that the promise was bargained-for, and the agreement contains the requisite mutuality of obligation. As the magistrate concluded,

> a reasonable interpretation of the parties' intent at the time they entered into the separation agreement would be that father was undertaking an obligation to contribute some amount towards his daughters' college educations, but that father was also reserving some measure of discretion to limit the extent of his financial obligation based on his ability to pay and all of the other circumstances existing at the time of the college matriculation.

¶ 33. We conclude, therefore, that the agreement is not illusory and is not unenforceably indefinite. Because we do not rely on father's past performance in assessing father's legal obligation, we do not address father's challenge to the superior court's application of the doctrine of past performance.

### III. Application of Reasonableness Requirement

¶ 34. For the above reasons, the critical issue in this case is the reasonableness of father's refusal to accept his daughters' college choices. Father challenges the magistrate's conclusion on this point, arguing that Indie's tuition should be capped by the tuition at UVM; that he should not be obligated to pay any tuition costs for Indie's education at UMSON because Indie transferred from GMU to UMSON and unreasonably gave up significant grant and schol-

arship funds; and that his obligation to pay Francesca's tuition should be limited to the costs of a two-year dental-hygiene degree at VTC. He further argues that the magistrate erred in crediting scholarships and grants to the daughters' nontuition costs first, rather than applying them to reduce father's tuition obligation.

¶ 35. ▐ In determining whether college expenses are reasonable, courts have considered a host of factors, including "the financial resources of both parents, . . . the financial resources of the child, the cost of the school, the programs offered at the school, the child's scholastic aptitude, how the school meets the child's goals, and the benefits the child will receive from attending the school. Also relevant . . . is the extent to which a party unjustifiably may have been excluded from the college decision-making process." *Mandel v. Mandel*, 906 N.E.2d 1016, 1022 (Mass. App. Ct. 2009) (quotations and alterations omitted); see also *Hathaway*, 98 S.W.3d at 680 (noting that the "majority view" is that court must "determin[e] whether the child's choice of college is reasonable," considering child's needs, parent's ability to pay, and cost of tuition).

¶ 36. ▐ ▐ The magistrate's findings concerning these factors were supported by the evidence, and the magistrate's conclusions were supported by the findings and were within the magistrate's discretion. Father took the position that any tuition amount above $10,000 per year per daughter is per se unacceptable. We recognize that cost is a valid and often compelling consideration, and that in other circumstances approval might reasonably be withheld on this basis. See, e.g., *Mazurek*, 96 A.3d at 375-82 (crediting evidence on costliness of institution, among other factors, in determining that father reasonably withheld approval); *Hathaway*, 98 S.W.3d at 680 (noting that because college-tuition provision is subject to implied condition of reasonableness, parent is not obligated to pay for child to "attend any college, regardless of cost" (quotation omitted)). However, under the circumstances of this case, the magistrate did not abuse her discretion in concluding that father's $10,000 cap is unreasonable. The evidence supported the magistrate's findings that father has quite substantial income, in the range of $350,000 to $400,000 per year. He incurred annual losses from his thoroughbred horse farm of $35,000 to $40,000, and paid more in monthly veterinary bills for the horses than he was willing to pay for each daughter's college tuition. The evidence supported the magistrate's findings that the

daughters are progressing reasonably in pursuit of degrees that are reasonably necessary for their chosen careers, and that both daughters are mature young women who have chosen practical educations that will enable them to be employed immediately upon graduation. The evidence also showed that $10,000 — father's suggested cap on his obligation — would not be sufficient to pay even in-state tuition at UVM, which was $12,888 for the 2011-12 year.

¶ 37. In connection with this reasonableness analysis, we reject father's arguments that his obligations should be reduced because daughters could have made less-expensive choices. First, we note that the magistrate did adjust the amount owed by father so that for Indie's junior year at UMSON father is obligated to pay only the tuition that Indie would have incurred had she remained at GMU. More importantly, the magistrate's conclusion that the daughters' college choices, and by extension the costs associated with them, were reasonable, given their reasonable educational and career aspirations and father's very substantial resources, was not an abuse of discretion.

¶ 38. Father's arguments on these points are similar to the claims raised in the Pennsylvania case of *Pharoah v. Lapes*, 571 A.2d 1070 (Pa. Super. Ct. 1990). In *Pharoah*, the settlement agreement provided that the parties would contribute to their children's college educations commensurate with their ability to pay. The parties' son (a class valedictorian) was admitted to the Massachusetts Institute of Technology (with a small scholarship) and the Georgia Institute of Technology (with a full-tuition scholarship). He chose to attend MIT. The father objected to paying the additional costs of tuition at MIT because Georgia Tech had offered the son a tuition-free education. *Id.* at 1072 & n.2. The Pennsylvania Superior Court found no abuse of discretion in the trial court's order obligating appellant to pay the additional costs of tuition at MIT, because the son "had testified to his educational accomplishments and aspirations and the reasons behind his decision to attend" MIT, and "gave a detailed accounting and explanation of his living expenses." *Id.* at 1072-75; see also *Spitzer v. Tucker*, 591 A.2d 723, 724-25 (Pa. Super. Ct. 1991) (affirming trial court's order requiring father to pay child's tuition at Syracuse University even though child could have attended Penn State). As in these Pennsylvania cases, we conclude that the evidence of the reasonableness of the daughters' choices under the circumstances supports the magistrate's conclusions in this case.

¶ 39. We likewise reject father's argument that the magistrate erred in deciding to credit scholarship and grant funds received by the daughters toward their nontuition costs before applying any excess to tuition, reducing the amount payable by father. Father argues that this decision "is wholly unsupported by the express language of the agreement."

¶ 40. The agreement is silent on the application of scholarship and grant funds. Courts have varied in their approach to allocating grant and scholarship funds in the absence of express guidance in the agreement and order. Some have held that scholarship or grant funds should be applied to reduce the parents' obligation, even if such funds would have otherwise gone to pay nontuition costs of attendance incurred by the student. A leading case is *Norrell v. Norrell*, 225 S.E.2d 305 (Ga. 1976). There, a provision required the father to "pay tuition" for his son, but the son received a significant scholarship. *Id.* at 305-06. The Georgia Supreme Court held that the scholarship should be credited against the father's obligation, so he was responsible only for the "net tuition," notwithstanding the fact that the son had nontuition costs of attendance to which the scholarship may have applied. *Id.*[6]

¶ 41. Other courts, however, have applied scholarship and grant funds to nontuition expenses first. See *Weber v. Weber*, 1998 WL 78669, at *6 (Ohio Ct. App. Feb. 11, 1998) (noting that court will "subtract the amount by which any grant or scholarship amount *exceeds* nontuition expenses," and that such a "formula will allow [father] to benefit from . . . any amount of financial aid *in excess of* his remaining tuition liability") (emphasis added). In favor of this interpretation is the "public policy strongly favor[ing] parental contributions to a child's education," which necessarily "militates against any reading of this stipulation which would obviate the agreed-upon parental obligation and transfer costs unnecessarily to the student." *S.B. v. J.R.*, 977 N.Y.S.2d 591, 597 (Sup. Ct. 2013).

---

[6] Several courts have followed this approach. See, e.g., *In re Marriage of Gowdy*, 816 N.E.2d 372, 374-76 (Ill. App. Ct. 2004) (interpreting provision directing that parents would each pay 10% and daughter would pay 80% of all college expenses to allow parents to receive an offset for "any scholarships or grants that [daughter] actually received," even though this would have the effect of raising costs to daughter); *Best v. Best*, 470 N.E.2d 84, 87 (Ind. Ct. App. 1984) (adopting *Norrell* rule that "tuition," unless otherwise defined, "means tuition fees less financial aid or scholarships received by the student").

¶ 42. ▮ Pennsylvania courts have not addressed the question, and the agreement itself does not provide any guidance. Moreover, the record lacks extrinsic evidence that clarifies the parties' intentions in entering into the agreement. In the absence of such information, we conclude that the daughters should receive the benefit of grants and scholarships which they earned before the excess of those funds is applied as a credit to father's obligation.

*Affirmed.*