J-S08042-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF K.L.V. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1481 WDA 2017 |

Appeal from the Order Dated September 7, 2017
in the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  34-ADOPT-2016

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                FILED MARCH 19, 2018

Appellant, C.R. ("Mother"), files this appeal from the Order dated

September 7, 2017, and filed September 8, 2017,[1] in the Fayette County Court

_____

[*] Former Justice specially assigned to the Superior Court.

[1] While the docket reflects a recorded date of September 8, 2017 and an affidavit of service included with the order indicates that copies were sent on September 8, 2017, there is no notation on the docket that notice was given and that the order was entered for purposes of Pa.R.C.P. 236(b).  See Frazier v. City of Philadelphia, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); see also Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)".).  Thus, the order was not entered and the appeal period not triggered.  Moreover, in transmitting the certified record for purposes of appeal, the Clerk of Orphans' Court Division of the Court of Common Pleas of Fayette County only provides this Court a list of documents composing the certified record as opposed to a certified copy of the docket entries as also required.  See Pa.R.A.P. 1921 (requiring the record contain a certified copy of the docket entries prepared by the clerk of the lower court).

of Common Pleas, denying her petition to involuntarily terminate the parental

rights of Father to his minor son, K.L.V. ("Child"), born in June of 2008.  After

review, we affirm the trial court's order.

The trial court summarized the relevant procedural and factual history,

in part, as follows:

BACKGROUND

The background of this case in quite convoluted.  [Child] was born [in] June [of] 2008 in New York.  According to Mother, [Child] was conceived as the result of a "one-night stand."  She deliberately concealed her pregnancy and [Child]'s birth from Father.  At the time, Mother was in a committed relationship with [another woman,] K.V., and had been since 2005.  Mother and K.V.'s relationship has been tumultuous.  The two moved to Fayette County in December 2007, while Mother was pregnant with [Child].[2]  When [Child] was seven months old, Mother and K.V. separated, prompting K.V. to file a custody complaint claiming in loco parentis status of [Child] on February 6, 2009.[3] Neither party joined Father as an indispensable party to the action, but they entered into a consent order on March 2, 2009. The two women reconciled some time thereafter and were married in Connecticut in 2010.

_____

We do note, however, that a docket report is included with the notice of appeal.  While we consider the matter on the merits, we caution the Clerk as to compliance with the rules with regard to the entry of orders and provision of certified copy of docket entries.

[2] Mother testified that she was temporarily residing in Wellsville, New York when Child was conceived.  Notes of Testimony ("N.T."), 8/30/16, at 16.  She later suggests that she briefly resided in New York again in 2011 around the time of the paternity proceedings.  Id. at 34-35.

[3] From the record, it is unclear as to when K.V. raised the issue of in loco parentis standing.  Nevertheless, this issue is irrelevant to and not dispositive of our decision.

Sometime in April 2011, they separated again, and Mother, in an attempt to gain full custody of [Child], contacted Father and made him aware of [Child]'s existence and the pending custody action. Father quickly filed a paternity action in New York, and in May 2011, DNA testing confirmed that Father was [Child]'s biological father. Mother eventually reconciled with K.V. again, and the two women intentionally distanced [Child] from Father. When Father attempted to intervene in the custody action, he was told by Mother that she would file harassment charges against him.[4] Father actively tried to locate [Child], Mother, and K.V. to no avail.

In early 2012, Father retained counsel, Brent Peck, Esq., in Fayette County and counsel was able to locate Mother, K.V. and the child. Due to financial hardship, however, Father did not file a new custody action until July 16, 2013. A mediation conference was held in December 2013,[5] and Father's custody action was dismissed due to the existing action between Mother and K.V.[6] Mr. Peck attempted to refer Father to the Southwestern Pennsylvania Legal Aid Society due to Father's inability to continue paying. Legal Aid was unable to represent Father. On July 28, 2015, after Father was able to gather the money to pay counsel, he filed a petition to intervene in the custody action [between Mother and K.V.] Another custody mediation conference was held, and by Order dated February 24, 2016, Father was granted visitation with [Child] on February 25, 2016 and daily phone calls. By additional Order dated February 25, 2016, Father was awarded additional visitation on March 26, 2016 and April 22-23, 2016. Mother and K.V. failed to deliver the child for the first custody exchange, even though Father traveled from New York to exercise

_____

[4] Father testified that, subsequent to the establishment of paternity, he was threatened with harassment charges. N.T., 8/30/17, at 46, 55-56.

[5] Evidence presented at the June 29, 2017 hearing reveals that this mediation conference actually occurred in October 2013, not December 2013. See Respondent's Exhibit 2. Notably, Mother and K.V. failed to appear at this and all other mediations, while Father traveled from New York to appear. N.T., 6/29/17, at 14, 21, 23-24.

[6] There appears to be some disparity as to whether the initial custody matter filed by Father was dismissed or whether he agreed to withdraw the action. N.T., 6/29/17, at 7, 14, 37. Regardless, the docket reflects that the referral to mediation was vacated. See Respondent's Exhibit 2.

his rights, and they never allowed a single phone call between Father and [Child].

On March 3, 2016, Father filed a petition for contempt for their failure to deliver the child on February 25, 2016 and the failure to permit phone contact. On March 9, 2016, following a hearing where neither Mother nor K.V. appeared, the Honorable Judge Joseph M. George, Jr., found Mother and K.V. in contempt and ordered make-up custodial time on March 25, 2016 and again ordered Father's visit on March 26, 201[6]. Father again traveled from New York in order to exercise his custodial time with [Child], and Mother and K.V. again failed to deliver the child as ordered.

On March 31, 2016, Father filed another petition for contempt. Another contempt proceeding was held before Judge George on April 22, 2016, and neither Mother nor K.V. appeared. Judge George issued a bench warrant for their immediate arrest, and after they were apprehended on April 25, 2016, he sentenced both women to a period of thirty (30) days' imprisonment.

On June 2, 2016, another custody mediation conference was held, and Father was granted additional custodial time with [Child] due to Mother and K.V.'s continuing course of contemptuous conduct. Mother and K.V. continued to willfully disobey all court orders and instead filed the above-captioned Petition.[7] The first hearing was held before this [c]ourt on August 30, 2016, and Father appeared late and without counsel. At the time, this [c]ourt and the appointed Guardian ad Litem were completely unaware of the troubling history of the custody case, despite hearing testimony from both Mother and K.V., who were represented by counsel, and Father, who appeared pro se. Upon further review, the [c]ourt appointed counsel for Father. Court[-]appointed counsel petitioned the [c]ourt for an additional hearing.

On June 29, 2017, that second hearing was held. Counsel presented the court records and orders and offered the testimony of Attorney Peck.[8] The Guardian ad Litem changed her

_____

[7] Mother filed the instant Petition for Involuntary Termination of Parental Rights on July 7, 2016.

[8] Father additionally testified again on his own behalf and presented Respondent's Exhibits 1 through 3 and 5 through 10, which were admitted.

- 4 -

recommendation in light of the new evidence, and the parties submitted briefs and authority in support of their respective positions.

Opinion, 9/8/17, at 1-4 (citations to record omitted) (footnotes omitted).

By Order dated September 7, 2017, and filed September 8, 2017, the trial court denied Mother's petition to terminate Father's parental rights. Accompanying this Order was an Opinion addressing the trial court's rationale for the failure to terminate Father's parental rights. Thereafter, on October 7, 2017, Mother, through counsel, filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), and on October 10, 2017, a timely notice of appeal.[9] See Pa.R.A.P. 903(a) (notice of appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken.") Pursuant to a Statement in Lieu of Opinion filed November 9, 2017, the court incorporated the Opinion accompanying its Order, which addressed the issues raised on appeal. See Statement in Lieu of Opinion, 11/9/17.

On appeal, Mother raises the following issues for our review:

1. Did the [t]rial [c]ourt commit an error of law and/or abuse of discretion when it held that [Father] made reasonable attempts to overcome any obstacles created by Appellant in asserting his parental rights?

2. Did the [t]rial [c]ourt commit an error of law and/or abuse of discretion when it reversed its initial finding and held that

_____

[9] Both the notice of appeal and concise statement are dated October 5, 2017.

[Father]'s failure to perform parental duties was solely due to [Father]'s "misconduct?"[10]

3. Did the [t]rial [c]ourt commit an error of law and/or abuse of discretion when it failed to find that [Father] was estopped from asserting his parental rights after failing to pursue a custody action for over three years after his initial custody action was withdrawn?

4. Did the [t]rial [c]ourt commit an error of law and/or abuse of discretion when it found that [Buccieri v. Campagna, 889 A.2d 1220 (Pa.Super. 2005)] was inapplicable to the instant case?

Mother's Brief at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at [325-26, 47 A.3d at] 827. We have previously emphasized our

_____

[10] We observe that Mother fails to preserve a claim as to any "initial finding" as she fails to address it in the argument section of her brief. See In re W.H., 25 A.3d 330, 339 n.3 (Pa.Super. 2011), appeal denied, 611 Pa. 643, 24 A.3d 364 (2011) (quoting In re A.C., 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); see also In re M.Z.T.M.W., 163 A.3d 462, 465-66 (Pa.Super. 2017). We note, however, that the trial court did not issue any finding after the initial August 30, 2016 hearing.

deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

In re T.S.M., 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc) (quoting Matter of Adoption of Charles E.D.M., II, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case sub judice, Mother sought to terminate Father's parental rights based upon his failure to perform parental duties.[11]   We, therefore, review the court's order pursuant to subsection 2511(a)(1) and (b), which provide as follows:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

As to Section 2511(a)(1), we have explained as follows:

> To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the

---

[11] While Mother did not file for termination pursuant to specific subsections of Section 2511, she used language suggestive of subsection (a)(1).  Petition for Involuntary Termination of Parental Rights, 7/7/16, at ¶7.

termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

In re Z.S.W., 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed:

> [I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

In re D.J.S., 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." In re B., N.M.,

856 A.2d 847, 855 (Pa.Super. 2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (2005) (citation omitted).

Further, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role.  The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

In re Z.P., 994 A.2d 1108, 1119 (Pa.Super. 2010) (citation omitted); see also In re Adoption of C.L.G., 956 A.2d 999, 1006 (Pa.Super 2008) (en banc).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties.  Parental duty is best understood in relation to the needs of a child.  A child needs love, protection, guidance, and support.  These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child.  Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.  A parent must utilize all

- 10 -

available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

In re B., N.M., 856 A.2d at 855 (internal citations omitted).

In the instant matter, in finding a lack of grounds for termination under subsection (a)(1), the trial court acknowledged that Father failed to perform parental duties. The court, however, concluded that Father was not at fault. Opinion, 9/8/17, at 7. The court found that, once Child's existence was revealed to Father, Father made attempts toward a relationship with Child, but faced numerous impediments. Id. at 7-8. The court likewise found Mother's reliance on Buccieri v. Campagna, 889 A.2d 1220 (Pa.Super. 2005), unfounded. Opinion, 9/8/17, at 8-9. The court reasoned as follows:

> It is true that Father has never performed parental duties for [Child]. However, this was not Father's fault. Father and Mother never had a relationship beyond the single sexual encounter, and this event occurred while Mother was in a committed relationship with K.V. . . .
>
> [Child]'s existence was intentionally concealed from Father for almost three (3) years. When Mother and K.V. started battling over custody, Mother only included Father (and first notified him of [Child]'s birth) because she believed Father would give her a tactical advantage against K.V. Once she and K.V. reunited, Father was again an unnecessary nuisance. Father filed the paternity action in his home state, and as soon as it was confirmed that he fathered [Child], he began pursuing custodial rights in Fayette County.
>
> Father encountered several obstacles along the way, including his location in New York, the child's location in Fayette County, financial hardships, and the intentional concealment of [Child]'s whereabouts. Father retained legal counsel but was

unable to pay in full for the necessary legal services. As soon as he had sufficient funds, he pursued the custody action, which included several trips to Fayette County from New York. He never missed a court proceeding or a custody exchange. In fact, Father made every reasonable effort to see [Child]. Mother and K.V. thwarted his efforts so stubbornly that they served jail time for contempt of court, serving the entire sentence imposed rather than revealing the whereabouts of [Child]. As noted above, most of this information was deliberately concealed from the Court and Guardian ad Litem at the first hearing in this matter.

Mother heavily relies on the Pennsylvania Superior Court case Buccieri v. Campagna, 889 A.2d 1220 (Pa.Super. 2005) in support of her position. In that case, mother and father had a brief intimate relationship, and mother informed father that she was pregnant. Buccieri, supra, 889 A.2d at 1221. According to mother, father did not believe her, and father left mother one week later. Id. at 1221, 1223. The child was born on November 8, 1996, and approximately four years later, father, mother, and child had a chance encounter at a park. Id. at 1221-22. Father did not commence custody and paternity actions until 2004, despite being fully aware of the child's existence. Id. at 1222. He never asked to visit and did not buy the child gifts or offer any financial assistance. Id. In the interim, mother married another man, who sought to adopt the child, as he had been acting in loco parentis to her, and he and mother had another child that was biologically their own. Id. at 1222[,] 1228. The trial court permitted father's paternity action to proceed, and mother appealed that order. Id. at 1222. The Superior Court reversed the trial court's holding because mother did not hide her pregnancy from father, yet father failed to exercise any parental duties for eight (8) years. Id. at 1228. The court held, "When balanced against societal concerns for constancy in the child's life, we see no reason to allow [father] to march into [the child's] life at this late date." Id.

Buccieri is not applicable to this case. As soon as Father was made aware of [Child's] existence, he commenced a paternity action, and as soon as scientific evidence established that he was the father of [Child], Father began taking the necessary steps to have a relationship with him. The father in Buccieri did not attempt to take responsibility for his child until four to eight years after he knew he had fathered the child. This case is completely different. Father cannot be penalized for the three years he was deliberately denied knowledge of [Child]'s existence, and he

cannot be penalized for the six and one half years since, when his efforts to establish a relationship with [Child] have been contemporaneously ignored and actively resisted throughout that time.

While it is true that Father has not performed parental duties, this was only because of Mother's and K.V.'s misconduct in the custody case. Father's testimony in this regard is found to be true. Father never forfeited his right to have a relationship with [Child]. This [c]ourt cannot reward Mother's abhorrent and illegal conduct by granting her petition against Father.

Opinion, 9/8/17, at 7-9.

Mother, however, argues that, despite knowledge as to Child in April or May 2011, Father did not file for custody until July 2013. Mother's Brief at 9. Further, once withdrawn, Father did not then file to intervene in the existing custody action until July 2015. Id. Importantly, Mother indicates a lack of contact or support between these filings. Id. at 9-10. She states as follows:

In the instant matter, it is clear that despite his knowledge of [Child]'s existence, [Father] made a very minimal effort to perform parental duties or to cultivate a parent-child relationship. [Father] first learned of the child's existence in April or May, 2011. However, he took no action legal or otherwise to even see the child until he filed a custody action on July 16, 2013. After that action was withdrawn, [Father] made no further attempt legal or otherwise to assert his parental rights to [Child] until he filed a petition to intervene in the custody action. . . . During the time periods between these filings, [Father] was aware of [Mother's] address. [Mother and K.V.] did not relocate from May, 2011 through July, 2015. Further, [Mother] was represented by the same counsel throughout the said period. However, [Father] at no time throughout the said period sent financial assistance, gifts or cards for [Child], nor did he attempt to contact [Child] through [Mother and K.V.] or their counsel.

Id. While recognizing Father's claims of obstacles created by Mother and K.V., Mother asserts that any such activity did not occur until after the most recent

custody order. Id. at 10. Mother indicates that, as to the period of time between April or May 2011 and July 2015, Father points only to financial difficulties and that "he could not financially afford to pursue litigation." Id.

Moreover, Mother argues that, regardless of any more recent action on the part of Father prior to the filing of the termination petition, there was already abandonment resulting in estoppel. Id. at 10-11.

> Finally, it is of no avail that [Father] finally took action prior to the filing of the instant petition. . . . Here[,] as in Buccieri, [Father] knew he was [Child]'s father in May, 2011. Due to his failure to assert his parental rights in any meaningful way until July, 2015, he is estopped from attempting to assert those rights now, as his abandonment of [Child] had already occurred by July 2015.

Mother's Brief at 11.

Mother concludes and summarizes as follows:

### CONCLUSION

> . . .[Father]'s failure to assert his parental rights to [Child] through legal action or otherwise from May, 2011 until July, 2015 constitute abandonment under 23 Pa.C.S.A. [§ 2511(a)(1)]. [Father]'s justification that he could not afford counsel does not explain his failure to make other attempts to provide for or contact [Child].

> Further, it is not persuasive under this court's precedents. Finally, as the abandonment had already occurred by July, 2015, [Father] is estopped from asserting his rights.

Id. at 12. We disagree.

Upon review, as we discern no abuse of discretion with regard to the trial court's determinations, we do not disturb them. The record reveals efforts by Father to overcome obstacles, including those created by Mother,

and to establish a relationship with and play a role in Child's life and in the six months prior to the filing of the petition for termination, as well as prior.

There is no dispute that Father filed for and established paternity timely upon being informed of Child's existence in 2011. See Petitioner's Exhibit 1. Father thereafter filed for custody in July 2013, after he was able to locate Mother, secure counsel, acquire the necessary finances, and effectuate service.[12] N.T., 6/29/17, at 61-66; N.T., 8/30/16, at 47. Then, subsequent to withdrawal and/or dismissal, Father filed to intervene in the existing custody matter in July 2015, once able to acquire the necessary finances again. Id. at 67, 72; 49.

Counsel who represented Father with regard to custody confirmed Father's diligence in the face of financial difficulties and informational obstacles with respect to Child's whereabouts. N.T., 6/29/17, at 11, 13, 17. Notably, counsel indicated that Father not only maintained a desire to seek custody of Child, but maintained regular contact with counsel. Id. at 17-19. In response to whether Father remained in contact from 2013 to 2015, counsel stated, "Oh, numerous phone calls, numerous conversations, I have various file notes where he called just to check in and say, hey, I saw this on Facebook,

---

[12] Father testified that after the paternity test results were disclosed in May 2011, Mother, Child, and K.V. "disappeared," stating, "we couldn't find them, we couldn't find them on anything." N.T., 6/29/17, at 61. Father additionally indicated that he was threatened with harassment charges. N.T., 8/30/16, at 46, 55-56.

this is what's going on, and please, I'm working, I'm trying to get the money together." Id. at 17. With regard to this period, he continued,

> . . . . This guy has steadfastly maintained to me that he wants to see this child, repeatedly, during all periods, particularly during the period from the filing of the original custody action which was vacated until he was able to come up with the retainer fee to [p]etition to [i]ntervene into the existing custody action. He maintained continuous contact with me asking to visit with his child.

Id. at 18-19.

Moreover, once he filed for intervention in the existing custody matter in July 2015, a full year prior to the filing of the petition to terminate, Father has remained active and involved. Father attended several mediation conferences, and was awarded and attempted to exercise custody, traveling from New York, only to be intentionally thwarted. As a result, Father filed several petitions for contempt and attended hearings regarding these petitions, again traveling from New York. N.T., 6/29/17, at 20-21, 23-31, 34, 48. Critically, at the hearing on June 29, 2017, the parties stipulated that Father expended money on attorney's fees, travel, lodging, food, and loss of time from work. Id. at 56. As noted by the court, "Clearly, your client took aggressive action during the last six months, so that's not an issue. . . ." Id. at 59. In fact, counsel for Mother conceded on the record that, once Father filed to intervene, "he made a lot of efforts." Id. at 21. Thus, the record fails to support grounds for termination pursuant to Section 2511(a)(1).

Further, we reject Mother's assertion that, as Father had already abandoned Child by July 2015, he was now estopped from asserting parental rights. We find that Buccieri is inapplicable as it applies to the establishment of paternity, not the termination of parental rights. 889 A.2d at 1228. As this court stated, "If [Father] had signed an Acknowledgment of Paternity within the last 8 years, his action for custody would have proceeded as would [Mother's] action for termination of parental rights. The issue before this court is not the termination of [Father]'s parental rights, but whether those parental rights should be established to begin with." Id. at 1227 (emphasis added). In the instant matter, Father has established his paternity and has been attempting to enforce his parental rights through seeking custody. Notably, Father sought to establish paternity in a timely manner after Mother finally advised him about Child in 2011. In addition, for the reasons stated above, we find the contention that Father had abandoned Child by July 2015 unfounded. Therefore, any argument of estoppel by Mother is without merit and fails.

As we find that the trial court did not abuse its discretion in concluding Father's conduct did not warrant the termination of his parental rights, there is no need to engage in a subsection (b) analysis. See In re P.Z., 113 A.3d 840, 850 (Pa.Super. 2015) (only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section (b)).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately declined to terminate Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/19/2018