J-A02018-24

2025 PA Super 177

| STEVEN M. SITLER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ALEXAS JONES | : | |
| | : | |
| Appellee | : | No. 1402 MDA 2023 |

Appeal from the Order Entered September 11, 2023
In the Court of Common Pleas of Columbia County
Civil Division at No(s): 2023-MV-22-MV

BEFORE: NICHOLS, J., KING, J., and SULLIVAN, J.

OPINION BY KING, J.: **FILED: AUGUST 14, 2025**

Appellant, Steven M. Sitler, appeals from the order entered in the Columbia County Court of Common Pleas, denying his petition against Appellee, Alexas Jones, to establish paternity and for genetic testing of Appellee's child, R.G.J. (born in May 2023) ("Child").[1] We reverse.[2]

------

[1] We use the parties' names in the caption "as they appeared on the record of the trial court at the time the appeal was taken." Pa.R.A.P. 904(b)(1). Notably, "upon application of a party and for cause shown, an appellate court may exercise its discretion to use the initials of the parties in the caption based upon the sensitive nature of the facts included in the case record and the best interest of the child." Pa.R.A.P. 904(b)(2); **see also** Pa.R.A.P. 907(a). Neither party has applied to this Court for the use of initials in the caption. Nevertheless, we will refer to the minor child as "Child" to protect Child's identity.

[2] As we discuss in further detail **infra**, this Court initially affirmed the order denying Appellant's petition on March 5, 2024. On April 25, 2025, the Supreme Court vacated and remanded the matter back to this Court for further consideration. **See Sitler v. Jones**, 312 A.3d 334 (Pa.Super. 2024), *vacated and remanded*, ___ Pa. ___, 334 A.3d 861 (2025).

In its opinion, the trial court set forth the relevant facts of this case as follows:

> [Appellee] had sexual relations with [B.J. ("Appellee's husband")] and [Appellant] near the time of conception of Child. No one has performed DNA testing upon Child and [Appellee's h]usband (or [Appellant] for that matter) to determine biological paternity. [Appellant filed a petition to establish paternity and for genetic testing on July 5, 2023.] A hearing on the Complaint was held on August 21, 2023.
>
> [Appellee] married [her husband] on March 25, 2022. [Appellee] and [Appellee's h]usband have an elder child, L.J., born [in] January…2021. Both [Appellee] and [Appellee's h]usband testified that their marriage is intact. They have never separated and continue to live together with Child and L.J. as a family unit. [Appellee's h]usband is designated on Child's birth certificate as Child's father. Emotional bonding has occurred between [Appellee's h]usband and Child. [Appellee's h]usband works first shift and cares for Child during [Appellee's] work during third shift, doing all that is necessary such as feeding, changing and bathing. [Appellee] and [Appellee's h]usband hold [Appellee's h]usband out to "everybody" as the father of Child, including family, co-workers and friends. [Appellee's h]usband testified that he will love and care for Child as his own regardless of the identity of the biological father of Child.
>
> [Appellant] has never seen Child and has no relationship with Child. In October of 2022, after [Appellant] was advised by [Appellee] that she was pregnant and that the then unborn child might be his, [Appellant] told [Appellee] that [Appellant] "wanted nothing to do" with the then unborn child. One week later, [Appellant] inquired again and said he did want to have a relationship with the then unborn child. [Appellant] filed a custody action on May 17, 2023, …[shortly] after Child was born.
>
> For a time, [Appellee] talked as if [Appellant] was the biological father of Child, verbally and in text messages. Despite this, [the court] found as fact that [Appellee] had sexual relations with both [Appellee's h]usband and

- 2 -

[Appellant] near the time of conception and that no test result has been obtained which determines inclusion or exclusion of either [Appellee's h]usband or [Appellant] as the biological father of Child. Therefore, [Appellee's] talk in this regard was based only on supposition.

(Trial Court Opinion, filed 9/11/23, at 1-2; R.R. at 5a-6a).

Following a hearing, the court denied Appellant relief on September 11, 2023. The court decided that the presumption of paternity applied in this case because Appellee's marriage to her husband was intact. (**See id.** at 4; R.R. at 8a). Moreover, the court held that paternity by estoppel applied to bar Appellant relief. (**Id.** at 4-5; R.R. at 8a-9a).[3] Appellant timely filed a notice of appeal on October 9, 2023, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

As previously mentioned, this Court initially affirmed the order denying Appellant's petition. In doing so, this Court acknowledged that we were constrained to apply the current Pennsylvania precedent, which provided that the presumption of paternity, namely—that a child born to a married woman is the child of the woman's husband—is **irrebuttable** where there was an intact marriage. Because the record supported the trial court's finding that Appellee and her husband's marriage was intact, this Court applied the irrebuttable presumption of paternity to conclude that Appellant was not entitled to relief.

---

[3] The court reiterated these conclusions in its Rule 1925(a) opinion. (**See** Rule 1925(a) Opinion, filed 10/10/23, at 1-2; R.R. at 24a-25a).

- 3 -

Further, this Court declined to address whether the trial court improperly applied the doctrine of paternity by estoppel, recognizing that the doctrine applied only in circumstances where the presumption of paternity had been rebutted or did not apply. *See Brinkley v. King*, 549 Pa. 241, 250, 701 A.2d 176, 180 (1997) (plurality) (explaining that **if** presumption of paternity has been rebutted or is inapplicable, then court examines whether paternity by estoppel applies, which may operate to bar plaintiff from making claim or bar defendant from denying paternity).

Finally, this Court considered Appellant's argument that the public policy behind the Commonwealth's interest in protecting the family unit no longer outweighs a child's right to know his or her biological father, particularly given the advances in genetic testing which Appellant argued can be easily used to rebut the presumption of paternity. Although Appellant advanced a compelling argument for a change in our law, this Court noted that as an error-correcting court, we were unable to afford Appellant the relief he sought. *See Matter of M.P.*, 204 A.3d 976, 986 (Pa.Super. 2019) (explaining this Court is bound by decisional and statutory legal authority, even when equitable considerations may compel contrary result; "We underscore our role as an intermediate appellate court, recognizing that the Superior Court is an error correcting court and we are obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania").

Our Supreme Court subsequently granted Appellant's petition for

- 4 -

allowance of appeal and vacated and remanded the matter to this Court for further consideration.[4]  Thereafter, this Court ordered supplemental briefing.[5]  The matter is now ripe for our review.

In Appellant's supplemental brief, Appellant raises the following issue for our review:

> Does the new test set forth by the Supreme Court of Pennsylvania, as it pertains to Presumption of Paternity, require the Trial Court to Order DNA testing of the minor child to determine if [Appellant] is [Child's] biological father?

(Appellant's Supplemental Brief at 6).

In reviewing cases involving a question of paternity, we will not disturb a trial court order absent an abuse of discretion.  *Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa.Super. 2007).

> An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order.  Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence.  It is not enough for reversal that we, if sitting as a trial court, may have made a different finding.

*Id.* (quoting *Doran v. Doran*, 820 A.2d 1279, 1282 (Pa.Super. 2003)).

Further:

> "The finder of fact is entitled to weigh the evidence presented and assess its credibility."  *Smith v. Smith*, 904

---

[4] We discuss the Supreme Court's decision in this matter in depth *infra*.

[5] Appellee did not file a responsive brief to Appellant's principal brief or file a supplemental brief upon the Supreme Court's remand.

A.2d 15, 20 (Pa.Super. 2006). In so doing, the finder of fact "is free to believe all, part, or none of the evidence and we as an appellate court will not disturb the credibility determinations of the court below." *Id.* (citation omitted).

*Vargo, supra*.

Appellant argues that he is entitled to relief under the new test established by our Supreme Court because (1) there is a reasonable possibility that DNA testing would confirm that Appellant is Child's biological father; and (2) because DNA testing will serve Child's best interests. Specifically, Appellant contends that he engaged in unprotected sexual intercourse with Appellee during the week of Child's conception, and Appellee later confirmed that Appellant was Child's biological father verbally and through "Snapchat" messages. Appellant asserts that genetic testing will serve Child's best interests because it will allow for concrete self-identification, knowledge of biological parentage and heritage, and discovery of possible genetically determined health conditions. Appellant further claims that he deserves to know if he is Child's biological father. Appellant highlights that Appellee's husband stated that he will love Child regardless of biological parentage. Moreover, Appellant submits that the interests of Appellant, Appellee, and Appellee's husband do not outweigh the interests of Child, who deserves to know his biological identity. Appellant insists that he has satisfied both prongs of the Supreme Court's new test by clear and convincing evidence. Appellant concludes that the trial court erred and abused its discretion in dismissing his petition, and this Court must grant relief and order DNA testing. We agree.

On appeal from this Court's initial decision, our Supreme Court recognized that the presumption of paternity (providing that when a child is born to a married woman, her husband is presumed to be the child's father) historically rested on two policy rationales: (1) to protect children from the social stigma and legal discrimination that accompanied a child's status as "illegitimate"; and (2) to serve the goal of preserving marriages and family units. *Sitler, supra* at ___, 334 A.3d at 866. Our High Court explained that "[s]ince the eclipse of legitimacy-based distinctions in the law, this latter rationale has been the sole pillar on which the presumption rests." *Id.*

Traditionally, the presumption of paternity "could be overcome only by clear and convincing evidence that: (1) the presumed father lacked access to the mother at the time of conception; (2) the presumed father was impotent; or (3) the presumed father was sterile." *Id.* Thus, under the existing paradigm:

> The presumption only applies when the marriage at issue is found to be intact. To the extent that the marriage is intact, the presumption is irrebuttable, and cannot be overcome. A court may not order genetic testing unless and until that presumption is overcome. But an intact marriage renders the presumption both applicable and irrebuttable, rendering the old avenues for rebuttal—non-access to the wife, impotence, sterility—irrelevant. **Under the operative regime, the only way to secure court-ordered testing is to prove that the marriage is no longer intact.**

*Id.* at ___, 334 A.3d at 868 (emphasis added) (internal footnotes omitted).

Our High Court took note that the presumption of paternity has become less reflective of our current social and legal realities as it pertains to marriage

and divorce. In tandem, the Court also noted the evolution of genetic testing and reproductive advancements. The Court stated:

> Today, DNA testing is more accurate, more affordable, and less intrusive than the blood tests of the 1980s. The DNA test sought by [Appellant] obtains a sample by means of an oral swab rather than a blood draw. A sample from the alleged father presumably would establish his own biological relationship to the child, or lack thereof, without need for a sample from the presumed father. These tests are now readily available for purchase by anyone, whether online or at a drugstore.
>
> At its inception, the presumption supplied a fact that, otherwise, could not be categorically determined. The traditional avenues for rebuttal reflect only those factual indicia available before the dawn of genetic testing: whether the husband could not have "accessed" the wife at the time of conception, and whether the husband was impotent or sterile. With the emergence of *in vitro* fertilization and advances in treatment for men's reproductive health, these traditional avenues for rebuttal no longer reflect insurmountable obstacles to conception. **In the past, the presumption helped fill in a critical blank. Today, the presumption forces courts to turn a blind eye to a fact that can be determined readily by empirical evidence, and that consenting parties may discover on their own in any event.**

*Id.* at \_\_\_, 334 A.3d at 870-71 (emphasis added) (internal footnotes omitted).

The Supreme Court further acknowledged arguments from critics of the presumption of paternity. Specifically, the Court recognized the argument that a child at the center of a paternity dispute has an interest in knowing the identity of his or her biological father, such that the child may know his or her own paternal background, health profile, and ethnic heritage. *Id.* at \_\_\_, 334

A.3d at 871-72. Additionally, the Court noted the arguments for early DNA testing, stating: "The news that the man whom a child believed to be his or her father is in fact a biological stranger can be damaging to a child's relationships and sense of identity." *Id.* at ___, 334 A.3d at 872. DNA testing also prevents a presumed father from being deceived into raising and supporting a child that is not his. *Id.* On the other hand, the Court acknowledged that "the presumption of paternity may serve to shield a child from the upheaval that can result from the introduction of a new legal parent, particularly when the child already has established a close bond with the man whose paternity is challenged." *Id.*

Consequently, the Court indicated that "[a] case-by-case approach, sensitive to individualized facts and contexts, is best-suited to the task of resolving paternity disputes." *Id.* The Court acknowledged that "[p]aternity disputes, like other controversies involving a child's future, implicate the best interests of the child. All else being equal, where two or more adults claim paternity, a child's best interests ultimately may lie in having the truth of the matter discovered." *Id.* at ___, 334 A.3d at 874 (internal footnote omitted). The Court also considered the interests of the putative father, presumed father and the mother. *Id.* With the contemporaneous legal, societal, and policy considerations in mind, our High Court recognized that "an irrebuttable presumption of paternity rests on outdated assumptions." *Id.* Thus, the Court articulated a new test regarding the determination of paternity:

To summarize: In order to determine the paternity of a child born in wedlock, courts first must determine whether the marriage is intact at the time of the paternity challenge. If so, then the presumption of paternity applies, and dictates that, regardless of biology, the mother's spouse will be the child's parent. **However, the presumption may be rebutted if the putative father produces clear and convincing evidence that: (1) there is a reasonable possibility that DNA testing would reveal him to be the child's biological father; and (2) determining parentage based upon DNA testing serves the best interests of the child, with due consideration for the interests of the potential father as well as the interests of the wife and husband.** If the court finds no threshold possibility of paternity, or determines that adjudicating paternity by DNA testing would disserve the relevant interests, then the presumption governs. But if the court finds a threshold possibility of paternity, and determines that the balance of interests lies in assigning paternity based upon the biological truth, the presumption must yield, and the court should order appropriate genetic testing to determine paternity of the child.

*Id.* at \_\_\_, 334 A.3d at 877 (emphasis added) (internal footnote omitted).

In conducting the best interests inquiry, the Court noted:

Unless and until the legislature acts, we entrust the contours of the best interests inquiry for purposes of determining legal parentage to the lower courts to develop on a case-by-case basis. For present purposes, we note that the factors included in Section 613 of the Uniform Parentage Act appear well-aligned with the standard we announce today, insofar as they account for both the best interests of the child and the interests of potential parents. Those factors include:

(1) the age of the child;

(2) the length of time during which each individual assumed the role of parent of the child;

(3) the nature of the relationship between the child and each individual;

(4) the harm to the child if the relationship between the child and each individual is not recognized;

(5) the basis for each individual's claim to parentage of the child;

(6) other equitable factors arising from the disruption of the relationship between the child and each individual or the likelihood of other harm to the child; ...

(7) the facts surrounding the discovery [that] the individual [might or] might not be a genetic parent of the child; and

(8) the length of time between the time that the individual was placed on notice that the individual [might or] might not be a genetic parent and the commencement of the proceeding.

*Id.* at ____ n.87, 334 A.3d at 877 n.87 (quoting Uniform Parentage Act § 613(a), (b)(1)-(2) (Unif. L. Comm'n 2017) (renumbered)). Having articulated a new test regarding the presumption of paternity, the Supreme Court vacated and remanded the matter back to this Court for further proceedings consistent with its opinion.

Instantly, the trial court noted that the marriage between Appellee and her husband was intact at the time of the paternity challenge. (*See* N.T. Hearing, 8/21/23, at 33; R.R. at 58a) (stating: "As a factual finding…, I'm going to find that this is an intact marriage. I don't have a choice. Everyone inside it says it's intact"). As we explained in our initial decision, the record supports the trial court's factual finding in this respect. Thus, the presumption of paternity is applicable here. *See Sitler, supra* at ____, 334 A.3d at 877. Under the Supreme Court's new test, however, Appellant may rebut this

presumption if he proves both prongs of the test by clear and convincing evidence. *See id.*

With respect to the first prong, whether there is a reasonable possibility that DNA testing will reveal Appellant as Child's biological father, Appellee admitted at the hearing that she was "[n]ot 100%" certain of the biological father of Child and that she had a sexual relationship with Appellant at or about the time of conception. (*See* N.T. Hearing at 10-11, 28; R.R. at 35a-36a, 53a). Appellant also produced a "Snapchat" message from Appellee which stated, in part:

> …**I just wish I didn't get pregnant but can't really change that now, we'll have to figure out a schedule if you want to be in their life but we found out that the hospital is automatically going to put [Husband] on the birth certificate and I think it would be easier that way, then you'll never have to worry about me trying to get child support from you** and it'll be easier for me name wise for school and appointments for them, I'm sorry for everything but I think it was not a good time for anything [that] happen[ed] between us because I was in a very vulnerable spot when we started everything and that led to some poor choices[.] I want to be friends but that's it, **I will never deny you a relationship with the kid but I'm not forcing or pushing for one either, that's up to you. And as far as anyone at work needs to know its [Husband's] kid and that's what we're telling our [f]amilies.**

(*See* Plaintiff's Exhibit 1; R.R. at 61a-62a) (emphasis added).

On this record, Appellant has established by clear and convincing evidence that there is a reasonable possibility that DNA testing would reveal Appellant to be Child's father. *See Sitler, supra* at ___, 334 A.3d at 877.

- 12 -

Therefore, the first prong of the new test is satisfied. ***Id.***

The second prong of the new test analyzes whether determining parentage based upon DNA testing serves the best interests of Child, with due consideration for the interests of Appellant as well as the interests of Appellee and Appellee's husband. ***See id.*** Although the trial court did not expressly consider the best interests inquiry in this context because it did not have the benefit of the Supreme Court's new test,[6] the record before us is sufficient to analyze these competing interests.

Thus, we turn to the relevant factors suggested by the Supreme Court. ***See id.*** at ____ n.87, 334 A.3d at 877 n.87. Regarding factor one, we reiterate that Child was born in May 2023 and is just over two years old. With respect to the second factor, Appellee and Appellee's husband have assumed the roles of the parents of Child since Child's birth and Appellant has not seen Child since Child's birth. Concerning the third factor, Child is emotionally bonded to Appellee and Appellee's husband and has no bond or relationship with Appellant. As the trial court recognized, "[Appellee's husband] provides care for Child as much as [Appellee] does, with each covering when the other is [at] work." (Trial Court Opinion at 4-5; R.R. at 8a-9a). Notably, Appellee's husband testified that he will continue to love Child regardless of biology. (***See*** N.T. Hearing at 31; R.R. at 56a).

_____

[6] The trial court conducted a best interests analysis relative to its application of the doctrine of paternity by estoppel, which we discuss ***infra***.

Regarding the fourth factor, we recognize that to discover that Appellee's husband is not Child's father could obviously be damaging to Child, who has bonded with Appellee's husband, and to Appellee's husband. On the other hand, denying Child knowledge of biological parentage is also harmful to Child and to Appellant, who wants to be involved in Child's life. With respect to the fifth factor, both Appellant and Appellee's husband have sound grounds to claim parentage of Child—Appellee's husband based on the underlying presumption of paternity and because Appellee's husband has raised Child so far; and Appellant based on Appellee's representations that he might be Child's biological father due to their unprotected sex around the time of Child's conception.

Concerning factors six and seven, we recognize that revealing Appellant as Child's biological father may cause some disruption now to Child's life and routine should Appellant be awarded custody. Nevertheless, a later-in-life revelation that Child's biological father is in fact a third party would undoubtedly cause distress to all parties involved. As Child is just over two years old, he will not have a conscious understanding of the results of a DNA test. Further, Child has a right to know his own paternal background, health profile, and ethnic heritage. Regarding the eighth factor, Appellee notified Appellant while she was pregnant that Appellant might be Child's biological father. Notably, Appellant filed a custody complaint a mere eight days after

Child's birth,[7] and the instant petition to establish paternity and for genetic testing two months after Child's birth.

As our Supreme Court recognized: "All else being equal, where two or more adults claim paternity, a child's best interests ultimately may lie in having the truth of the matter discovered." *See Sitler, supra* at ___, 334 A.3d at 874. Upon review of all factors and circumstances, we hold that determining parentage based upon DNA testing will serve the best interests of Child. As such, the second prong of the new test is satisfied. *See Sitler, supra*, at ___, 334 A.3d at 877. Therefore, Appellant has successfully rebutted the presumption of paternity.

We reiterate that the trial court also found Appellant's claim to relief barred under the doctrine of paternity by estoppel. Having originally concluded that the presumption of paternity applied under the pre-existing law, this Court had initially declined to consider whether paternity by estoppel would bar Appellant's claim to relief. *See Brinkley, supra*. The Supreme Court expressly directed this Court to consider upon remand whether paternity by estoppel applies. *See Sitler, supra* at ___, n.18, 334 A.3d at 865 n.18 (stating: "Based on pre-existing law, the Superior Court held that the presumption of paternity precluded DNA testing. It did not reach the question of estoppel. In light of our rulings today regarding the presumption, the

---

[7] The record indicated that at a custody conference on July 5, 2023, the court declined to move forward with the custody matter without paternity testing.

Superior Court should consider on remand whether estoppel would preclude DNA testing in this case. Inasmuch as the Superior Court did not reach the issue, we do not address the merits of the trial court's estoppel ruling at this time") (internal citation omitted). Indeed, the Court noted that "[e]stoppel may yet, of course, independently preclude DNA testing, even if the presumption does not." *Id.* at ___, n.88, 334 A.3d at 877 n.88.

Following our directive for supplemental briefing, Appellant relied on the argument set forth in his principal brief regarding the applicability of paternity by estoppel. (*See* Appellant's Supplemental Brief at 8, 13) (relying on Appellant's Principal Brief at 17-26). Regarding this issue, Appellant argues that the theory of paternity by estoppel was created to protect the child's conscious understanding of the identity of his or her parent. Appellant insists that the doctrine should be used to protect a child from harm caused by a parent who has held himself out to be that child's parent for years, then later denies parentage. Appellant posits that "[p]aternity by estoppel is not to be used as a sword by [a] married couple to sever the possibility of discovering a child's actual biological father…when overwhelming evidence exists that the alleged father is, in fact, the biological father[.]" (Appellant's Principal Brief at 24). Appellant submits that the cases applying paternity by estoppel are distinguishable to the case at bar, and that application of the doctrine in this case does not serve Child's best interests. Appellant concludes that the trial court erred by dismissing his petition on the basis of paternity by estoppel,

and this Court must grant relief. We agree.

Paternity by estoppel is based on the policy rationale that children should be secure in knowing who their parents are. **Fish v. Behers**, 559 Pa. 523, 530, 741 A.2d 721, 724 (1999). "If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father." **Id.** (quoting **Brinkley, supra** at 249-50, 701 A.2d at 180).

In other words, "[p]aternity by estoppel is merely the legal determination that because of a person's conduct (*e.g.*, holding the child out as his own or supporting the child), that person, regardless of his true biological status, will not be permitted to deny parentage[.]" **M.L. v. J.G.M.**, 132 A.3d 1005, 1007 (Pa.Super. 2016) (internal citation and quotation marks omitted).

> [T]he law will not permit a person in these situations to challenge the status that he or she has previously accepted. The doctrine of paternity by estoppel seeks to protect the interests of the child.
>
> [Thus,] paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child.

**Id.** (internal citations and quotation marks omitted).

Our Supreme Court has also recognized:

> Although estoppel has been applied most frequently to prevent fathers from **denying** paternity when they have

acted as fathers in the lives of their children, the doctrine applies equally … where [a putative father] denied his paternity, never held himself out to be father, and never took responsibility, financial or otherwise, for Child.

*In re Adoption of S.A.J.*, 575 Pa. 624, 639, 838 A.2d 616, 625 (2003) (emphasis in original) (applying doctrine of paternity by estoppel where putative father had been absent from child's life over course of twelve years; mother and her husband have taken entire responsibility for child; thus, appellant was equitably estopped from undoing situation that he created by his words and failure to act). *See also B.K.B. v. J.G.K.*, 954 A.2d 630, 636 (Pa.Super. 2008) (holding paternity by estoppel barred putative father from asserting parentage due to his inaction for period of nine years).

This Court reached a similar conclusion in *Buccieri v. Campagna*, 889 A.2d 1220 (Pa.Super. 2005). There, this Court stated:

> On this record, Appellee's own delay and inactivity for eight years now bars him from confirming or asserting his paternity through genetic tests. When balanced against societal concerns for constancy in the child's life, we see no reason to allow Appellee to march into [Child's] life at this late date. As a practical matter, [Child's] health and social history can still be completed. The record raises no genuine question as to whether Appellee is [Child's] biological father. Under the circumstances of this case, Appellee is estopped by his own past conduct from obtaining genetic tests to establish his paternity and/or assert his paternal rights.

*Id.* at 1228 (reversing order granting appellee's petition for paternity testing).

Instantly, the trial court applied both the presumption of paternity and the doctrine of paternity by estoppel to bar Appellant's claim for genetic testing. Regarding the latter, the trial court reasoned:

- 18 -

> Likewise, the doctrine of Paternity by Estoppel applies. [Appellant] flip-flopped in his claim, first saying that he wanted nothing to do with the then unborn child, then asserting himself by filing a custody action. Child is now approximately four (4) months old and emotional bonding has occurred between [Appellee's] Husband and Child. [Appellee's] Husband provides care for Child as much as [Appellee] does, with each covering when the other is [at] work. [Appellee] and [Appellee's] Husband hold Child out to "everybody" as a child of [Appellee's] Husband. The law will not permit "pulling the carpet out from under" Child at this point to upset the family unit to which Child has become accustomed. This is regardless of the relatively young age of Child. Anyone who has raised a child and has seen a child smile at his or her parent's face, and otherwise react to the love and affection of a parent, knows that emotional bonding begins at birth and becomes very strong, very quickly.

(Trial Court Opinion at 4-5; R.R. at 8a-9a).

We cannot agree with the court's analysis. Unlike the putative fathers in the above-mentioned cases, Appellant has not delayed seeking parentage for a period of years. **Compare In re Adoption of S.A.J.**; **B.K.B., supra**; **Buccieri, supra**. Although Appellant admitted that initially after Appellant and Appellee ended their sexual relationship Appellant said he did not want anything to do with the then-unborn Child (**see** N.T. Hearing at 21; R.R. at 46a), Appellant changed his mind and decided he did want to be in Child's life. Notably, Appellant filed a custody complaint a mere eight days after Child was born. (**See id.** at 17; R.R. at 42a). Thus, Appellant has not come "marching" into Child's life after a significant delay. **Compare Buccieri, supra** at 1228.

To apply paternity by estoppel under the facts of this case would prevent Child from knowing his biological parentage. We cannot agree that applying

the doctrine in this case will serve Child's best interests. ***See M.L., supra***. Rather, for the same reasons as those articulated above, Child's best interests at this young age will be served by knowing his true parentage. Accordingly, we reverse and remand for the court to order genetic testing as requested in Appellant's petition.

Order reversed. Case remanded for further proceedings. Jurisdiction is relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/14/2025